UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

ROCKER MANAGEMENT, L.L.C.       :
ET AL.,                         :
                                :
        Plaintiffs,             :     CIVIL ACTION NO. 00-5965 (JCL)
                                :
        v.                      :     **MEMORANDUM AND ORDER**
                                :
LERNOUT & HAUSPIE SPEECH        :     (KPMG UK)
PRODUCTS N.V. ET AL.,           :
                                :
        Defendants.             :
_____:

## LIFLAND, District Judge

Plaintiffs Rocker Management, LLC, Rocker Partners, LP, Rocker Offshore

Management Company, Inc., and Compass Holdings Ltd. (collectively, "Rocker")

have asserted claims under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17

C.F.R. § 240.10b-5, promulgated thereunder by the United States Securities and

Exchange Commission ("SEC"), against Defendants Jozef Lernout, Pol Hauspie,

Gaston Bastiaens, Carl Dammekens, Allan Forsey, Ellen Spooren, Erwin

Vandendriessche, Gerald Calabrese,[1] Klynveld Peat Marwick Goerdeler

Bedrijfsrevisoren (a/k/a KPMG Bedrijfsrevisoren or KPMG Belgium), KPMG

International ("KPMG"), KPMG UK, KPMG LLP, Paul Behets, and SG Cowen

_____

[1]Section 20(a) claims are asserted against only the individual defendants.

Securities Corporation ("Cowen").[2]  Plaintiffs also assert state law claims for tortious interference with prospective economic advantage, conspiracy to tortiously interfere, and aiding and abetting tortious interference.

Before the Court are the Motions of Defendant KPMG UK to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2),[3] 12(b)(6), and 9(b).  As discussed more fully below, the Motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) will be denied and the Motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) will be granted.

## FACTS

The facts of this case are described at length in the Court's June 7, 2005 Memorandum and Order denying the motions to dismiss on behalf of individual defendants Jozef Lernout, Pol Hauspie, and Gaston Bastiaens.  Allegations relevant to resolving this motion are discussed herein, and are, as noted, taken

---

[2]A suggestion of death has been filed on behalf of Paul Behets.  In addition, the Court has been advised of a written and signed agreement to settle and release certain claims asserted against individual defendants Forsey, Spooren, Vandendriessche, and Calabrese.  The settlement is subject to certain conditions precedent, some of which have yet to occur.

[3]KPMG UK directs the Motion to dismiss for lack of personal jurisdiction to the First Amended Complaint (not yet filed at the time of briefing), even though it is based on the initial Complaint.  This is because Plaintiffs represented that the First Amended Complaint would not include any jurisdictional allegations not already contained in the initial Complaint.  Unless otherwise indicated, the Court bases its analysis on the allegations in the First Amended Complaint.

from the Amended Complaint and supporting affidavits/declarations.[4]

Plaintiff Rocker Management LLC ("Rocker Management") is a New Jersey company that administers and manages Plaintiff hedge fund Rocker Partners LP ("Rocker Partners"). (Am. Compl. ¶ 10). Plaintiff Rocker Offshore Management Company, Inc. ("Rocker Offshore") is a New York corporation that manages Plaintiff hedge fund Compass Holdings, Ltd. (Id.).

Defendant KPMG UK (now a Limited Liability Partnership) is a partnership organized under the laws of England and Wales.

Plaintiffs engaged in "short selling," which means identifying and purchasing stock that they expect to decline in price. (Am. Compl. ¶¶ 5, 11). Profits result from borrowing stock from various sources, selling that stock at current market prices, purchasing shares of the stock at a lower price to "cover" the original position, and then returning the stock to the original source. (Id.).

Plaintiffs began to short sell Lernout & Hauspie Speech Products N.V. ("L&H" or "the Company") stock in June 1998. (Am. Compl. ¶¶ 6, 100). The price of L&H stock subsequently increased, forcing Plaintiffs between December

---

[4]Affidavits and declarations, in addition to the pleadings, inform the inquiry as to personal jurisdiction. Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984); In re Arthur Treacher's Franchise Litigation, 92 F.R.D. 398, 410 n.11 (E.D. Pa. 1981).

1999 and March 2000 to purchase stock at a loss to cover their own short positions. (Id. ¶¶ 6, 104). Plaintiffs charge that the increase in L&H stock prices was the result of fraud on the part of L&H and/or SG Cowen. Plaintiffs further allege that the rise in L&H stock may be attributed to certain financial statements issued by L&H for the fiscal year 1998, which overstated L&H revenue. (Am. Compl. ¶¶ 51-52, 259). L&H's independent auditor was Defendant KPMG Belgium.

On April 9, 1999, KPMG Belgium published its Independent Auditor's Report on L&H's financial statements for the year ending December 31, 1998 (Id. ¶ 51). KPMG Belgium allegedly made several false statements in those certified financials. First, financial statements falsely reported L&H's 1998 revenues. KPMG Belgium itself withdrew its own certification in late 2000 and disclosed to the investing public that its financial statements "should not be relied upon." (Id. ¶¶4, 123). L&H's Audit Committee later acknowledged that the statements inflated L&H's actual income by nearly $28 million (including by 24% and 23% in the last two quarters of 1998, respectively). Second, KPMG Belgium represented that it conducted an "independent" audit, thereby indicating that it had no financial interest or ties to L&H management. In fact, the KPMG "global account partner" for L&H who was responsible for overseeing the audit, Paul

Behets, took a position with a L&H-related entity shortly after overseeing and certifying these falsified financials.  (Id. ¶ 267).  Third, KPMG Belgium represented that "[w]e conducted our audits in accordance with generally accepted auditing standards in the United States."  In fact, the financials violated many important aspects of United States generally accepted accounting principles ("U.S. GAAP"), including the backdating of contracts, contracts entered into with related parties, and the existence of side agreements releasing customers of their obligation to pay.  (Id. ¶ 209-10).  Finally, KPMG Belgium represented that the financials were "free of material misstatements," and that the financials "present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products, N.V.," when, in fact, they falsely inflated L&H's revenue by almost $28 million.  (Id. ¶ 52).

At times, the Amended Complaint uses "KPMG" to refer collectively to KPMG Belgium, KPMG US, and KPMG UK.  The following allegations refer to KPMG UK:  that "KPMG UK audited L&H's financial statements with KPMG Belgium and KPMG [US]," (id. ¶ 25); that KPMG UK "actively participated in the reviews and audit of L&H's financial statements," (id. ¶ 184); and that "a KPMG UK division called the US Capital Markets Group had vetted the [L&H] audits before they were filed with the SEC," (id. ¶ 187).  In addition, the Amended

Complaint alleges involvement in the L&H audits by Robert P. McLamb, a reviewing partner who was "based in KPMG's US Capital Markets Group or in KPMG US's Houston, Texas office" for the relevant period.  (Id.).

## ANALYSIS

**I.      Motion to Dismiss for Lack of Personal Jurisdiction**

Federal Rule of Civil Procedure 4(e) permits district courts to exercise jurisdiction over non-resident defendants as authorized by the laws of the state where the court resides.  Fed. R. Civ. P. 4(e);[5]  Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 31 (3d Cir. 1993); Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 436 (3d Cir. 1987); Dent v. Cunningham, 786 F.2d 176, 175 (3d Cir. 1986).  New Jersey's long-arm rule permits the exercise of jurisdiction to the fullest extent allowed under the Fourteenth Amendment to the United States Constitution.  N.J. Ct. R. 4:4-4(b)(1) (permitting exercise of jurisdiction "consistent with due process of law"); Charles Gendler & Co., Inc. v. Telecomm. Equip. Corp., 102 N.J. 460, 469 (1986); Avdel Corp. v.

---

[5] Fed. R. Civ. P. 4(e)(1)(A) states that:
Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed, other than an infant or an incompetent person, may be effected in any judicial district of the United States . . . pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State.

Mecure, 58 N.J. 264, 268 (1971); see also Mesalic v. Fiberfloat Corp., 897 F.2d

696, 698 (3d Cir. 1990); DeJames v. Magnificence Carriers, Inc., 654 F.2d 280,

284 (3d Cir. 1981).

 The Constitutional guarantee of Due Process limits federal jurisdiction to

shield "persons from the judgments of a forum with which they have established

no substantial ties or relationship." General Elec. Co. v. Deutz Ag, 270 F.3d 144,

150 (3d Cir. 2001). Personal jurisdiction is thus appropriate only when the

defendant has "purposefully established 'minimum contacts' in the forum State."

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe

Co. v. Washington, 326 U.S. 310, 316 (1945)); World-Wide Volkswagen Corp. v.

Woodson, 444 U.S. 286, 297 (1980) (personal jurisdiction rests on conduct and

connection with forum State such that defendant "should reasonably anticipate

being haled into court there"). Minimum contacts describe actions by which the

defendant "purposefully avails itself of the privilege of conducting activities

within the forum State," and thereby invokes "the benefits and protections of its

laws." Asahi Metal Indus. Co., Ltd. v. Superior Court of California, 480 U.S. 102,

109 (1987) (quoting Burger King, 471 U.S. at 475); Remick v. Manfredy, 238

F.3d 248, 255 (3d Cir. 2001). In addition to adequate  minimum contacts, courts

must determine that the exercise of personal jurisdiction sought by the plaintiff

would not offend "traditional notions of fair play and substantial justice." Burger

King, 471 U.S. at 476-77; Int'l Shoe, 326 U.S. at 316; Remick, 238 F.3d at 255.

The sufficiency of the defendant's minimum contacts with the forum state will

therefore vary with the "quality and the nature of the defendant's activity."

Hanson v. Denckla, 357 U.S. 235, 253 (1958).

A defendant may be subject to either the general or specific jurisdiction of

the forum state.  Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-

15 (1984); Deutz, 270 F.3d at 150.  Specific jurisdiction describes contacts that are

"purposefully directed" at a resident of the forum state, where "the injury arises

from or is related to those activities."  Deutz, 270 F.3d at 150 (discussing Burger

King, 471 U.S. at 472).  General jurisdiction exists when a defendant engages in

"continuous and systematic" contacts with the forum state, whether or not the

contacts are related to the injury giving rise to the cause of action.  BP Chems. Ltd.

v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000).  The greater

reach of general jurisdiction requires "significantly more than mere minimum

contacts," and the plaintiff seeking to exert general jurisdiction must show that the

defendant's contacts to the forum are "continuous and substantial."  Provident

Nat'l Bank, 819 F.2d at 437 (citations omitted).

When a defendant challenges jurisdiction over his person, the plaintiff has

the burden to demonstrate that jurisdiction over the defendant satisfies the requirements of Due Process.  Deutz, 270 F.3d at 150; Carteret Sav. Bank, F.A. v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992); Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992).  The Third Circuit has stated that when a challenge to personal jurisdiction is raised, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence," and "at no point may a plaintiff rely on the bare pleadings alone."  Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984); see also Stranahan Gear Co., Inc. v. NL Indus., Inc., 800 F.2d 53, 58 (3d Cir. 1986).

Where plaintiffs have not had the opportunity to conduct jurisdictional discovery, plaintiffs need only make a prima facie showing that the defendant is subject to personal jurisdiction in the forum.  See, e.g., Bryan v. Assoc. Container Transp., 837 F. Supp. 633, 639 (D.N.J. 1993).  Once plaintiffs have "established a prima facie case of jurisdiction, that suffices, regardless of any controverting presentation by the moving party, to defeat the motion."  LaRose v. Sponco Mfg. Inc., 712 F. Supp. 455, 458 (D.N.J. 1989).

### A.    KPMG UK's Contacts with the United States

KPMG UK maintains that there is no basis for this Court to assert general or

specific jurisdiction over KPMG UK.  According to the declaration of KPMG UK's Senior Partner Michael Derek Vaughan Rake, KPMG UK is a partnership organized under the laws of England and Wales.  KPMG UK maintains its principal place of business in London and has no offices in the United States. (Declaration of Michael Derek Vaughan Rake, April 8, 2002, ¶¶ 1, 3) ("Rake Decl.").  KPMG UK does not have an agent for service of process in the United States.  (Rake Decl. ¶ 3).  On the premises of KPMG UK in London is an entity known as U.S. Capital Markets Groups.  The sole purpose of that entity with respect to L&H was to assist KPMG Belgium on technical issues concerning U.S. GAAP.  (Rake Decl. ¶ 6).

KPMG UK is a dues-paying member of KPMG.  KPMG UK does not own and is not owned by KPMG.  (Rake Decl. ¶ 4).  KPMG does not perform professional services, but instead distributes practice and other voluntary guidelines that may be followed by member firms that wish to use the KPMG name.  A Membership Agreement and License Agreement between KPMG UK and KPMG expressly provide that "[n]othing contained herein shall be construed to place the parties in the relationship of agents, partners or joint venturers, and the Member Firm shall have no power to obligate or bind [KPMG] or any other Member Firm in any manner whatsoever."  (Rake Decl. ¶ 4).

KPMG holds itself out as a single, world-wide accounting firm.  For example, KPMG's global brochure states that its global clients "have extraordinary needs that can be met only by global advisers operating in a truly integrated fashion."  (Hermann Cert., Ex. 17).  KPMG coordinates the provision of services to its clients through three main operating regions: the Americas, Europe/Middle East/Africa, and Asia Pacific.  (Id.).  KPMG offers "client service teams [that] operate wherever . . . clients need them," made up of KPMG employees from around the globe.  (Hermann Cert., Ex. 17).  KPMG employees rotate on "international assignments" through the more than 150 countries in which KPMG has offices.  Indeed, KPMG promotes its employees' ability to work in different offices throughout the globe as an advantage to both its employees and its clients.  As KPMG puts it:

> It may be a European carmaker that must align its financial reporting to U.S. Generally Accepted Accounting Principles in preparation for trading shares on U.S. equity markets. . . .  Whatever the case, KPMG puts the right people with the right skills in the places where our clients need them–even if it's a world away.

(Id.).

## B.    Specific Jurisdiction

The Complaint alleges that L&H's independent auditor, Defendant KPMG Belgium, issued unqualified audit opinions concerning L&H's consolidated

financial statements for the years 1998 and 1999 that falsely stated that L&H's financial statements fairly presented the financial position of L&H and were in conformity with US GAAP. (Am. Compl. ¶¶ 6, 36, 60-61, 110, 115, 134, 136). The Complaint further alleges that KPMG UK "audited L&H financial statements with KPMG Belgium and KPMG LLP. (Id. ¶ 25). There are no specific allegations in the Amended Complaint that KPMG UK issued any audit opinions or made any statements connected to the L&H audits. While, at times, the First Amended Complaint uses the term "KPMG" to refer to both KPMG Belgium and KPMG UK, only one substantive allegation is specific to KPMG UK, namely, that "a special KPMG UK division called the U.S. Capital Markets Group had vetted the [L&H] audits before they were filed with the SEC." (Compl. ¶ 115). KPMG UK argues that the assertion that a division of KPMG UK "vetted" a Belgian accounting firm's audits of a Belgian company is insufficient to establish that KPMG UK "purposefully established 'minimum contacts'" in the United States or that KPMG UK "'deliberately' ha[d] engaged in significant activities" there that resulted in Plaintiffs' alleged injuries. See Burger King, 471 U.S. at 474-76 (citation omitted); see also Weber v. Jolly Hotels, 977 F. Supp. 327, 331 (D.N.J. 1997) (stating that plaintiff must "establish[] with reasonable particularity sufficient contacts between the defendant and the forum state") (quoting Mellon

Bank (E.) PSFS Nat'l Ass'n v. Farino, 960 F.2d at 1223).  KPMG UK thus urges

the Court to conclude that there is no specific jurisdiction over KPMG UK.  In any

event, KPMG UK denies that any KPMG UK partner or employee otherwise

"vetted" the audits of L&H for filing with the SEC.  (Rake Decl. ¶ 6); see also

Remick, 238 F.3d at 259 (dismissing complaint for lack of personal jurisdiction

where affidavits contradicted allegations in complaint).

Plaintiffs respond that KPMG UK–which holds itself out as a unified global

accounting firm–was specifically charged with insuring L&H's compliance with

U.S. GAAP for purposes of the company's SEC filings and its reports to investors.

Plaintiffs contend that KPMG UK's direct participation in the preparation of false

financial statements to be filed with the SEC and press releases to be published

and disseminated to U.S. investors that caused significant foreseeable effects in

the United States establishes sufficient contacts with the United States to subject it

to the jurisdiction of this Court.  Plaintiffs further contend that KPMG UK's

conduct, although outside of the United States, directly impacted the price of L&H

stock on the NASDAQ exchange in the United States.  Plaintiffs tie KPMG UK's

participation to the conduct of Robert McLamb, a partner who worked during part

of the relevant period out of the U.S. Capital Markets Group in London.  The

following specific contacts took place between KPMG UK and the United States:

1.    On July 8, 1998, KPMG UK sent an "Inter-Office Debit Note" to KPMG Belgium in the amount of £64,750.00 for: "Professional services rendered by the US Capital Markets Group for the period from April 1998 to June 1998 in connection with various [Lernout & Hauspie] SEC filings." (Hermann Cert., Ex. 3);

2.    KPMG Belgium included KPMG UK's fees on its invoices to Lernout & Hauspie.  (Hermann Cert., Ex. 4);

3.    Invoice noting that KPMG UK rendered "US Tax consulting services" to Lernout & Hauspie.  (Hermann Cert., Ex. 5);

4.    KPMG UK participated in the drafting of April 7, 1999 L&H press release announcing artificially inflated revenues and provided financial information to be used therein by marking up and commenting on an L&H press release from the prior quarter.  (Hermann Cert., Ex. 7);

5.    L&H's press release regarding revenues and earnings for the first quarter 1999 was sent to McLamb at KPMG UK for "review" and "feed back" prior to being issued.  (Hermann Cert., Ex. 8);

6.    In 1999, KPMG UK participated in the preparation, review, and revision of L&H's financial statements for the years ending December 31, 1997 and 1998 and further consented to republication in later filings with the SEC. (Am. Compl. ¶¶51-53, 73-75, 161, 162; Hermann Cert., Exs. 9-12); and

7.    "Group Audit Instructions" issued by KPMG Belgium in June 1999 stated that the "SEC reviewing partner [sic] are Bob McLamb of KPMG US Capital Markets Group London . . . ."  (Hermann Cert., Ex. 13 at 5). Likewise, "Group Audit Instructions" for the quarter ending September 30, 1999 stated that "US Capital Markets Group will be involved in the review of the SEC reporting issues."  (Hermann Cert., Ex. 14).

Based on the foregoing contacts, the Court is satisfied that there is specific

jurisdiction over KPMG UK.  "If a party performs an act that he knows or has

good reason to know will have effects in the forum, and if the exercise of jurisdiction by that forum is not unreasonable, then personal jurisdiction will lie . . . .” Reingold v. Deloitte Haskins & Sells, 599 F. Supp. 1241, 1259 (S.D.N.Y. 1984) (holding Australian accounting firm subject to jurisdiction for claims arising out of audit report that firm “knew or should have known” would be incorporated into a U.S. SEC filing); see also Itoba Ltd. v. LEP Group Plc, 930 F. Supp. 36, 41 (D. Conn. 1996) (holding individual director defendant and UK citizen subject to jurisdiction in the United States for claims arising out of his approval of Form 20-F filed with SEC, where evidence showed defendant wrote letter to Secretary of issuer stating “Thank you also for Form 20-F which I have received and on which I have no comment.”).  Here, Plaintiffs have established at least a prima facie case that KPMG UK knew or should have known that its input would be incorporated into a United States securities filing.  While the nature of the relationship between KPMG UK and U.S. Capital Markets Group of London is not altogether clear, it is undisputed that KPMG UK invoiced services performed by KPMG partner McLamb for work on the L&H SEC filings.  (Hermann Decl., Exs. 3-5).  Those invoices reflect that KPMG UK performed work on L&H “SEC filings” and offered “U.S. tax consulting services.”  (Hermann Decl., Exs. 3,5).  KPMG UK clearly knew that L&H was trading in the United States and knew of the SEC’s

annual filing requirements.  Since KPMG UK knew that L&H was trading in the United States, it should also have known that L&H shareholders and other United States investors would reasonably rely on the filings.  It follows that KPMG UK could reasonably expect to be haled into court to answer for its conduct in connection with the L&H filings.  The exercise of jurisdiction over KPMG UK on the basis of its participation in drafting and reviewing press releases and financial statements is eminently reasonable.

### C.    General Jurisdiction

For the sake of completeness, the Court also will address whether general jurisdiction exists over KPMG UK.  KPMG UK argues that Plaintiffs have failed to set forth any facts demonstrating that it engaged in "continuous and systematic" business activities within the United States sufficient to support a finding of general jurisdiction.  See Helicopteros, 466 U.S. at 416; Remick, 238 F.3d at 255.  Furthermore, KPMG UK maintains that its association with KPMG Belgium, a distinct, legally independent entity, cannot attribute to KPMG UK any conduct alleged to have been undertaken by any other KPMG entity.

Plaintiffs counter that KPMG UK's marketing materials and public statements reveal continuous and systematic contacts with the United States that support general jurisdiction.  KPMG UK holds itself out to the world as part of an

integrated global entity that provides services to its clients worldwide, and often holds itself out as indistinguishable from its U.S. counterparts.  KPMG employees rotate between their UK and U.S. offices, and serve together on "global teams" that identify their members simply as "KPMG partners," without regard to their national offices.  Furthermore, Plaintiffs maintain that KPMG UK conducts business in the United States of its own accord.

The Court is satisfied that KPMG UK has sufficient contacts with the United States to support a finding of general jurisdiction.  This is due both to KPMG UK's relationship with KPMG International and also KPMG UK's conduct of business in the United States on its own.  There can be no doubt that KPMG offices are integral parts of a single global enterprise that conducts business in the United States.  That KPMG UK deliberately markets and promotes itself as part of an integrated global network severely undercuts its present attempt to divest itself of a relationship with that network in order to defeat the exercise of personal jurisdiction.  See Sleigh Corp. v. Bureau Van Diik, 1996 WL 219638, at *3 (S.D.N.Y. May 1, 1996) ("Reaping the benefit of this representation [of having a global network], BvD Belgium cannot now disavow its connection to the same global network for personal jurisdiction purposes.").  Indeed, courts have found jurisdiction over foreign entities on the basis of globalization of services.  See,

e.g., First Am. Corp. v. Price Waterhouse LLP, 988 F. Supp. 353, 362 (S.D.N.Y. 1997), aff'd, 154 F.3d 16 (2d Cir. 1998) (finding Price Waterhouse partnership in New York acted as agent for purposes of personal jurisdiction over Price Waterhouse partnership in United Kingdom).

Relatedly, KPMG UK's argument that there is no legal relationship between it and KPMG International is unavailing.  For purposes of personal jurisdiction, a resident entity need not bear an official agency relationship to the foreign defendants, see Tuxxedo Network, Inc. v. Hughes Communications Carrier, 753 F. Supp. 514, 517 (S.D.N.Y. 1990), nor even any legal relationship at all to the foreign defendant, Volkswagen de Mexico, S.A. v. Germanischer Lloyd, 768 F. Supp. 1023, 1027 (S.D.N.Y. 1991); Price Waterhouse LLP, 988 F. Supp. at 362. Nor is it a requirement that a foreign defendant exercise direct control over the onshore agents.  Palmieri v. Estefan, 793 F. Supp. 1182, 1194 (S.D.N.Y. 1992); Bialek v. Racal-Milgo, Inc., 545 F. Supp. 25, 32 (S.D.N.Y. 1982).  Moreover, there need be no "financial or proprietary relationship" between the parties such as a division of profits and losses.  Intel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd., 116 F.R.D. 477, 481 (S.D.N.Y. 1987).  But see In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 170 (D. Mass. 2002) (rejecting global entity theory as a basis for liability to attach to KPMG UK for other KPMG

entities' acts and statements).

Price Waterhouse LLP decisions are directly on point and lend support to the Court's finding of general jurisdiction over KPMG UK. Price Waterhouse services its clients through a global network consisting of international member offices. In instances of an assignment requiring work to be done in another country, a member office in that country undertakes the work on behalf of the primary office and under the supervision of a global engagement partner. See Price Waterhouse LLP, 988 F. Supp. at 361-62, 363; Price Waterhouse LLP, 182 F.R.D. at 57-58; Price Waterhouse LLP, 1998 U.S. Dist. LEXIS 3936, at *9. Similarly, KPMG's global network allows KPMG UK to offer services in the United States to its global clients through the KPMG United States offices that, without its close relationship to the United States offices, KPMG UK itself would have to undertake in the United States. The rationale employed in the Price Waterhouse decisions is thus apt:

> Although PW-UK and PW-US have denied any partnership, and asserted that they exist as separate firms bearing the same name, their coordinated activities indicate an affiliation closer than that of unrelated corporations. This affiliation may not amount to one of parent and subsidiary, or common ownership, but it lends its weight to a determination that personal jurisdiction may be imposed over PW-UK based on its activities in the United States conducted through PW-US.

Price Waterhouse LLP, 988 F. Supp. at 363.

KPMG UK also conducts business on its own in the United States.  KPMG UK advertises its close relationship with U.S. offices so as to provide client services wherever and whenever needed and hosts "a team of 20 staff in the U.S.A., . . . working alongside company executives."  (Hermann Cert., Ex. 21). KPMG UK also sends its own employees to the United States as part of KPMG's international rotation and global programs.  (Hermann Cert., Ex. 17).  KPMG UK also hosts U.S. GAAP briefing meetings "[t]ailored primarily for the overseas operations of *US companies*."  (Hermann Cert., Ex. 25 (emphasis in original)).  As for business holdings, KPMG UK holds 60.4% of the shares of the United States-based KPMG Corporate Finance LLC, (Hermann Cert., Exs. 21, 27), and has substantial equity interests in other U.S. based corporations (Hermann Cert., Ex. 28).

The Court concludes that Plaintiffs have established a prima facie case that KPMG UK is doing business in the United States to a degree that renders it fair and reasonable for this Court to exercise jurisdiction.  Cf. Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 477-78 (S.D.N.Y. 2001) (holding Ernst & Young Bermuda subject to general jurisdiction where it was, among other things, actively involved in E&Y International network, received two employees from U.S. offices

as part of a Global Exchange Program, attributed 30% of its business to multinational clients whose accounts were managed by a "global account partner" some of whom were in the U.S., and had clients who were audited in accordance with GAAP and who filed financial statements with SEC).

## II. Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." In re Cybershop.com Sec. Litig., 189 F. Supp.2d 214, 223 (D.N.J. 2002) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). When resolving a motion to dismiss, a district court must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff. Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183 (3d Cir. 2000). However, the court need not credit "bald assertions" or "legal conclusions." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

### A. Section 10(b) and Rule 10b-5 Claims

To state a claim pursuant to Rule 10b-5, Plaintiff must allege that (1) the defendant made a misrepresentation or omission of a material fact; (2) scienter

motivated the defendant's misrepresentation or omission; (3) the defendant made the misrepresentation or omission in the context of a securities purchase or sale; (4) the plaintiff relied upon defendant's misrepresentation or omission; and (5) the plaintiff's reliance proximately caused damages.  In re Cybershop.com Sec. Litig., 189 F. Supp. 2d at 224.  Scienter may be pled by alleging facts (1) that demonstrate "'a motive and opportunity to commit fraud,'" or (2) that "constitute circumstantial evidence of either reckless or conscious behavior."  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999) (quoting Weiner v. Quaker Oats Co., 129 F.3d 310, 318 n.8 (3d Cir. 1997) (explaining what remains sufficient after passage of the Private Securities Litigation Reform Act ("PSLRA"))).

A plaintiff alleging false or misleading statements or omissions of material fact must meet the heightened pleading requirements of both Rule 9(b) and the PSLRA.  In re Cybershop.com, 189 F. Supp. 2d at 225.  Rule 9(b) requires that allegations of fraud, and the circumstances constituting the fraud, be pled with particularity.  Id.  While the particularity requirement may be relaxed where factual information is particularly within defendant's knowledge or control, "boilerplate and conclusory allegations will not suffice."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).

Federal Rule of Civil Procedure Rule 9(b) demands that a plaintiff plead (1)

a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.  In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)).  Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission.  Id. (citing Klein v. General Nutrition Cos., Inc., 186 F.3d 338, 345 (3d Cir.1999)).  In short, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'–that is, the 'who, what, when, where and how' of the events at issue."  Id. at 217 (quoting In re Burlington, 114 F.3d at 1422).

The PSLRA imposes an additional "layer of factual particularity" on allegations of securities fraud.  In re Rockefeller Center Properties, Inc. Secs. Litig., 311 F.3d at 217-18.  Under the PSLRA, a complaint alleging a Section 10(b) violation is insufficient unless it "specifies each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief[,] . . . state[s] with particularity all facts on which that belief is formed."  In re

Cybershop.com, 189 F. Supp. 2d at 226 (citing 15 U.S.C. § 78u-4(b)(3)(A)).  All

allegations of scienter must be supported by facts stated "with particularity" and

must give rise to a "strong inference" of scienter.  In re Advanta Corp. Sec. Litig.,

180 F.3d at 535 (quoting 15 U.S.C. 78u-(b)(2)).

There is no aiding and abetting liability in Section 10(b) actions.  Central

Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 177 (1994).

KPMG UK challenges the viability of the federal securities law and

common law claims brought against it.  It argues that the Section 10(b) claims

should be dismissed because (1) the allegations against KPMG UK identify no

misstatements or omissions by KPMG UK and at most amount to aiding and

abetting liability, which is no longer actionable as to 10(b) claims; (2) the claims

fail to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA

because they lack the required specificity as to KPMG UK; (3) the Amended

Complaint fails to allege that KPMG UK or any of its personnel acted with the

requisite scienter; and (4) the amended complaint does not allege "loss causation."

Plaintiffs counter that KPMG UK participated in the audits and revenue

compilation via McLamb, who was responsible for ensuring the compliance of

L&H financial reports with the United States GAAP rules.  McLamb is alleged to

be a KPMG SEC reviewing partner, "based" in the KPMG-UK division called the

US Capital Markets Group, who worked extensively on the L&H audit and review.  KPMG UK allegedly passed information to KPMG Belgium that was ultimately incorporated into L&H's financials.  Plaintiffs argue that KPMG UK's involvement is not "aiding and abetting" liability and the false statements made by McLamb and passed along for publication are sufficient to state a Section 10(b) claim.  (Am. Compl. ¶ 188 ("Conversion of Local to US GAAP has been reviewed by Bob McLamb and Digby Wirtz, audit partners of US Capital Markets London Office . . . .  All US reporting issues have been cleared with KPMG US Capital Markets Group London.'"); ¶ 193 ("'key issues were discussed and conclusions reached in agreement with advice from the US Capital Markets Group in London . . . .  KPMG personnel from all participating offices involved reviewed the revenue recognition . . . .'"); ¶¶ 211-12 (McLamb's knowledge of improper recognition of revenue with four supposed "customers"); and ¶ 227 (McLamb's knowledge of a single, lump-sum payment from a third-party source, to pay debts owed by several start-up "customers").  It is specifically alleged that McLamb "actually prepared and provided certain amounts and disclosures to L&H's 1998 financial statements."  (Am. Compl. ¶ 192).

There is no allegation that KPMG UK actually signed any of the audit reports or was listed in L&H's financial disclosures as a principal auditor.  Many

of the allegations that KPMG UK, via McLamb, knew of or reviewed certain documents at most amount to aiding and abetting.  However, in ¶ 192, it is alleged that McLamb prepared certain parts of the 1998 financial statements.  Whether McLamb's "preparation" of parts of the 1998 financial statements is sufficient to trigger primary liability is a close call.

Judge Saris in In re Lernout & Hauspie Securities Litig., 230 F. Supp. 2d 152, 168 (D. Mass. 2002), held that "[a]bsolving an auditor who prepares, edits, and drafts a fraudulent financial statement knowing it will be publicly disseminated simply because an affiliated auditor with which it is working under a common trademark is the one to actually sign it, would stretch Central Bank's holding too far."  In contrast, some circuits have held that for primary liability to attach, the public must be able to attribute a misleading statement to the secondary actor at the time it is issued.  See, e.g., Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) ("[A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination . . . that is, in advance of the investment decision."); Ziemba v. Cascade Int'l, 256 F.3d 1194, 1205 (11th Cir. 2001) ("Following the Second Circuit, we conclude that . . . the alleged misstatement or omission upon which a plaintiff relies must have been publicly attributable to the defendant at the time that the plaintiff's

investment decision was made.").  Plaintiffs point out and Defendants do not

dispute that the Third Circuit has not adopted this attribution requirement,

although some district courts in this circuit appear to have done so.  See, e.g.,

Copland v. Grumet, 88 F. Supp. 2d 326, 332-33 (D.N.J. 1999) (following Wright);

In re IKON Office Solutions, Inc. Sec. Litig., 131 F. Supp. 2d 680, 685 n.5 (E.D.

Pa. 2001) (same).

The Court is persuaded that the "public attribution" requirement espoused

by the Second and Eleventh Circuits and district courts in this Circuit should be

applied here.  Because there is no allegation that the public would attribute

misleading statements to KPMG UK at the time Plaintiffs made their investment

decisions (presumably, to cover their short sales), it is thus clear that KPMG UK

was not publicly attributed to the audit opinion of L&H's 1998 financial

statements when it was KPMG Belgium that issued and signed the audit opinion.

(Am. Compl. ¶¶ 24, 52, 293).

However, even assuming that McLamb's alleged role in preparing false

statements were sufficient to trigger primary liability under Rule 10b-5, the Court

concludes that his participation is not sufficient to trigger liability on the part of

KPMG UK.

Defendants argue, with no substantive opposition from Plaintiffs, that the

allegations concerning McLamb are insufficient to trigger liability on the part of

KPMG UK for several reasons.  First, the Third Circuit does not recognize agency

and respondeat superior liability under Section 10(b).  Rochez Bros., Inc. v.

Rhoades, 527 F.2d 880, 883-86 (3d Cir. 1975); see also In re Prudential Ins. Co. of

Am. Sales Practices Litig., 975 F. Supp. 584, 612-13 (D.N.J. 1997).  Second, even

if the Third Circuit did recognize such liability, McLamb's professional

relationship with KPMG UK is not at all clear from the Amended Complaint.

There are no allegations that McLamb was employed by KPMG UK, in an

employee or partner capacity, or that he was doing work for them.  At most, the

allegations speak to his physical location at KPMG UK during an unspecified time

period.  Plaintiffs' allegations that McLamb "worked with L&H . . . from both the

UK and US offices" (Am. Compl ¶ 37) or was "based in" the US Capital Markets

Group does not make clear how it is that KPMG UK could be liable.  Rather, the

allegations lapse into referring to KPMG as a global entity.

Plaintiffs argue that KPMG Defendants are a "single entity" that effectively

operate as one international auditing firm.  (E.g., Am. Compl. ¶¶ 182-84; Pls.'

Omnibus Opp. Br. at 62 ("[I]t is KPMG itself which holds itself out to the world

as "One Firm," with accountants in offices world wide available to assist in

servicing clients.")).  This is contradicted by KPMG's website, which states

> KPMG International is a Swiss Verein of which all KPMG firms are members.  Each member firm is a separate and independent legal entity (none is a parent, subsidiary or affiliate of another) and each describes itself as such (e.g., "KPMG LLP, a U.S. limited liability partnership, is a member of KPMG International" or "KPMG LLP, the U.S. member firm of KPMG International.).

(May 8, 2002 Meisels Decl., Ex. A).[6]  Plaintiffs' references to KPMG in the collective sense are simply too vague to meet the particularity requirements of Rule 9(b).  KPMG entities are legally independent of each other, and affiliated only by virtue of collaborative efforts and common membership.  Holding KPMG UK liable for misstatements by virtue of another KPMG entity's action runs contrary to the particularity demanded of this sort of securities claim.

Plaintiffs further argue that there were additional misstatements in that the L&H 1998 financial statement was republished in a 2000 Registration Statement and that KPMG was involved in reporting record revenues for 1999 that were described in a February 9, 2000 press release.  Here again, these statements are not publicly attributable to KPMG UK in any meaningful way.

---

[6]On a motion to dismiss, the Court may consider documents "integral to or explicitly relied upon in the complaint."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  KPMG International's website is cited and relied upon in the Amended Complaint, (Am. Compl. ¶ 182), as is KPMG International's 1999 Annual Report, (id. ¶ 183).  The Annual Report states that "KPMG International is a Swiss association with member firms in 159 countries that perform the professional services described in this report," (Meisels Decl., Ex. B at 32); and that financial information set out in the report "represents composite information of the separate member firms of KPMG International and is combined here solely for presentation purposes."  (Id. at 31).

Even if Plaintiffs' allegations were sufficient to allege material misrepresentations or omissions on the part of KPMG UK, the allegations still fail for lack of the requisite scienter, to which the Court now turns.

1.   *Scienter*

The scienter threshold contemplates "'a mental state embracing intent to deceive, manipulate or defraud.'"   In re Ikon Office Solutions Inc., 277 F.3d 658, 667 n. 7 (3d Cir. 2002) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).

KPMG UK argues that the Amended Complaint fails to state a claim against it because it does not meet the "exacting threshold" that requires Plaintiffs to allege with particularity facts giving rise to a strong inference of scienter, i.e., facts "establishing a motive and opportunity to commit fraud" or "constitut[ing] circumstantial evidence of either reckless or conscious behavior."   In re Advanta, 180 F.3d at 534-35.

This Court finds the allegations insufficient to meet the scienter requirement as to KPMG UK via US Capital Markets Group or McLamb.  The allegations informing the scienter inquiry are generally attributed to a global "KPMG" entity, as opposed to particular member entities.  See, e.g., Am. Compl. ¶¶ 182-268.  The only scienter-type allegations specific to KPMG UK via McLamb appear to be

post-issuance of the audit opinion on June 30, 1999. (E.g., Am. Compl. ¶¶ 211-13 (discussing January 5, 2000 email authored by McLamb signaling knowledge that certain agreements were in direct contravention of GAAP)). None of the allegations that Plaintiffs urge in support of the scienter requirement relate to the period preceding KPMG Belgium's certification of L&H 1998 financial statements in April l999, or their subsequent filing in June 1999. Also, none of the allegations relate to any revenue L&H recorded in 1998. Accord Lernout & Hauspie Securities Litig., 230 F. Supp. 2d at 169 (finding insufficient allegations concerning scienter as to KPMG UK).

   2.   *Loss Causation*

   KPMG UK further argues that the Amended Complaint does not support "loss causation" because it does not "demonstrate that the fraudulent conduct proximately caused or substantially contributed to causing plaintiff's economic loss." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 177, 181 n. 24 (3d Cir. 2001). The argument basically goes that numerous alleged intervening events render it "implausible" that the audit opinion on the 1998 financial statements could amount to a "substantial" factor in forcing Plaintiffs to cover their short positions beginning in late December 1999 and continuing through March 2000.

Having already concluded that the allegations in the Amended Complaint are not sufficient to allege a Section 10(b) claim against KPMG UK, the Court need not resolve the issue of loss causation.  However, if it were to reach the issue, the Court would hold that the Amended Complaint supports loss causation.

"[T]he Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1634 (2005) (citing Fed. R. Civ. P. 8(a)(2)).  The pleading rules "are not meant to impose a great burden on a plaintiff."  Id. (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513-15 (2002)). Rather, the goal is simply for "a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."[7]  Id. at 1634.

The Court is satisfied that the allegations relating to transaction causation in this short selling context are sufficient to withstand a motion to dismiss based on loss causation.  In the short-selling context, losses caused by artificially inflated stock prices are incurred at the time of cover.  (This differs from the typical fraud-on-the-market scenario where purchasers buy at a fraudulently inflated price and

---

[7]In Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627, 1631 (2005), the United States Supreme Court held that in fraud-on-the-market cases, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss."

then the stock subsequently drops once the truth is revealed to the market.)  Here, it is alleged that L&H stock climbed in price during the period of December 1999 to March 2000 as a direct result of the scheme that included the making and publishing of fraudulent statements concerning falsified earnings reports for 1998. The allegations also detail an unraveling of the fraudulent scheme and an attendant drop in price of L&H stock.  See, e.g., Am. Compl. ¶¶ 1-4.

Read in the light most favorable to short-selling Plaintiffs, the inference to be drawn from the allegations of the Amended Complaint is that the false financial statements artificially inflated L&H stock, which, in turn, forced Plaintiffs to make cover transactions and incur significant losses.  Fact-intensive issues related to causation and whether a given misstatement "substantially contributed" to Plaintiffs' losses, Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 177, 181 n. 24 (3d Cir. 2001), are not properly resolved at this juncture.

### B.    State Law Claims

The Amended Complaint alleges state law claims against KPMG UK for tortious interference with prospective economic advantage (Count V), conspiracy to engage in tortious interference (Count VI), and aiding and abetting tortious interference (Count VII) under state law.  Having dismissed the Section 10(b) claims against KPMG UK, the Court will not exercise supplemental jurisdiction

over the remaining state law claims against KPMG UK.  Where underlying federal

claims providing the Court with original jurisdiction have been dismissed, a

federal court has discretion to decline to exercise supplemental jurisdiction over

the remaining state law claims.  28 U.S.C. § 1367(a), (c).  Moreover, the Third

Circuit has recognized that "where the claim over which the district court has

original jurisdiction is dismissed before trial, the district court must decline to

decide the pendent state claims unless considerations of judicial economy,

convenience, and fairness to the parties provide an affirmative justification for

doing so."  Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (citations omitted).

There appearing to be no such considerations here, the Court will decline to

exercise jurisdiction over the tortious interference and conspiracy claims.

## CONCLUSION

For the foregoing reasons, KPMG UK's Motion to dismiss the Amended

Complaint for lack of personal jurisdiction will be denied and its Motion to

dismiss the Amended Complaint for failure to state a claim will be granted.

Accordingly, **IT IS** on this 7th day of June 2005,

**ORDERED** that the Motion of Defendant KPMG UK to dismiss the

Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) is

denied; and it is further

**ORDERED** that the Motion of Defendant KPMG UK to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) is granted.

/s/ John C. Lifland, U.S.D.J.