UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

ROCKER MANAGEMENT, L.L.C.                  :
ET AL.,                                     :
                                            :
          Plaintiffs,                       :        CIVIL ACTION NO. 00-5965 (JCL)
                                            :
          v.                                :        **MEMORANDUM AND ORDER**
                                            :
LERNOUT & HAUSPIE SPEECH                    :        (S.G. Cowen Securities Corporation)
PRODUCTS N.V. ET AL.,                       :
                                            :
          Defendants.                       :
_____            :

## LIFLAND, District Judge

Plaintiffs Rocker Management, LLC, Rocker Partners, LP, Rocker Offshore

Management Company, Inc., and Compass Holdings Ltd. (collectively, "Rocker")

have asserted claims under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17

C.F.R. § 240.10b-5, promulgated thereunder by the United States Securities and

Exchange Commission ("SEC"), against Defendants Jozef Lernout, Pol Hauspie,

Gaston Bastiaens, Carl Dammekens, Allan Forsey, Ellen Spooren, Erwin

Vandendriessche, Gerald Calabrese,[1] Klynveld Peat Marwick Goerdeler

Bedrijfsrevisoren (a/k/a KPMG Bedrijfsrevisoren or KPMG Belgium), KPMG

International ("KPMG"), KPMG UK, KPMG LLP, Paul Behets, and SG Cowen

_____

[1]Section 20(a) claims are asserted against only the individual defendants.

Securities Corporation ("Cowen") (collectively, "Defendants").[2]  Plaintiffs also bring state law claims for tortious interference with prospective economic advantage, conspiracy to tortiously interfere, and aiding and abetting tortious interference.

Before the Court is the Motion of Cowen to dismiss the Amended Complaint for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  For the reasons set forth below, Cowen's Motion will be denied.

## **FACTS**

The facts of this case are described at length in the Court's June 7, 2005 Memorandum and Order denying the motions to dismiss on behalf of individual defendants Jozef Lernout, Pol Hauspie, and Gaston Bastiaens.  Allegations relevant to resolving the present motion are discussed herein, and, as noted, are taken from the Amended Complaint.

Lernout & Hauspie Speech Products N.V. ("L&H" or "the Company"), formed in 1987 by Jo Lernout and Pol Hauspie, was a Belgian-American company

---

[2]A suggestion of death has been filed on behalf of Paul Behets.  In addition, the Court has been advised of a written and signed agreement to settle and release certain claims asserted against individual defendants Forsey, Spooren, Vandendriessche, and Calabrese.  The settlement is subject to certain conditions precedent, some of which have yet to occur.

that specialized in speech recognition, text-to-speech conversion, and digital speech compressions.  (Am. Compl. ¶¶ 1, 12).  L&H's stock was traded on American and European exchanges.  Since its initial public offering in 1995, L&H reported rapid growth in its revenues due to its domination of its software market, its acquisition of other companies, and its development of revolutionary and "industry first" products.  (Am. Compl. ¶ 32).

Following public announcements in late 1999 and the first quarter of 2000 concerning both its reported revenues and its products, in addition to "strong buy" recommendations from L&H's investment banker, Cowen, and revenue compilations by KPMG, L&H's stock price rose from less than $19 in late November 1999 to a high of $72 in 2000–upwards of a 300% increase.  (Am. Compl. ¶¶ 2, 63).  The increase in stock price is alleged to be the result of a scheme of fraud and deception on the part of L&H–together with its related capital funds, officers and directors, accountants, and investment bankers.  The unveiling of that scheme in the latter half of 2000, due to investigative reporting by the Wall Street Journal, sent the stock price into a tailspin.  The exchanges then halted trading in the stock, and L&H sought refuge in bankruptcy proceedings.

Plaintiffs began to short sell L&H stock in June 1998 (Am. Compl. ¶¶ 6, 100).  Short selling involves identifying and purchasing stock expected to decline

in price (Am. Compl. ¶¶ 5, 11).  Profits result from borrowing stock from various

sources, selling that stock at current market prices, purchasing shares of the stock

at a lower price to "cover" the original position, and then returning the stock to the

original source.  (Id.).  The rapid increase of L&H stock forced Plaintiffs between

December 1999 and March 2000 to purchase stock at a loss to cover their own

short positions.  (Am. Compl. ¶¶ 6, 104).

Cowen, a securities and investment banking firm, had a long-standing

business relationship with L&H.  (Am. Compl. ¶¶ 28, 275).  Cowen advised L&H

on acquisitions of companies, participated with L&H in the drafting of L&H press

releases, and "hyped" L&H's stock through certain analyst recommendations.

(Am. Compl. ¶ 275).

On September 15, 1998, Cowen issued an analyst report recommending

L&H stock as a "strong buy."  The report touted L&H's acquisition strategy as

being "highly successful, measured in both financial and strategic gains," and

stated that L&H's "acquisitions yield competitive advantage and yes, more

profits."  The report also categorized L&H's purchase accounting methods as

conservative.  (Am. Compl. ¶ 47).

Plaintiffs allege that Cowen advised L&H on its acquisitions of companies,

including Bumil, Dragon Systems, Inc., and Dictaphone.  (Id.).  Cowen is alleged

to have had access to information regarding L&H's revenues and financial performance and thus knew, or recklessly disregarded, that L&H's announced revenues were fraudulently overstated.  (Id.).  That notwithstanding, Cowen echoed and disseminated L&H's fraudulent claims of revenue growth and success in Asian markets in the January 5, 2000 and February 10, 2000 recommendations.

On January 5, 2000, Cowen disseminated a report on L&H authored by Robert Stone, recommending the stock as a "Strong Buy," and raising its price target, despite commenting that earnings estimates would be trimmed.  The Report stated, in relevant part:

> **Technology and Solutions Unit Doing Well With Telephony Deals in Asia -** In late December, LHSP announced a number of deals to develop on-line trading and automated dialogue systems for customers including: Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities and Daewoo Securities.  It also announced a number of other Asian contracts for speech technologies and TTS for applications such as unified messaging.

> **After Endless Short Yammering In 1999, Shares Testing New Highs On Strong 2000 Prospects** - In late 1998 and early 1999 a policy change at the SEC prompted LHSP to restate results related to write-downs of acquired R&D in process.  The SEC apparently raised no other issue with LHSP's accounting practices, and many other companies that had made acquisitions and followed then-common accounting treatment were in the same situation.  However, some short sellers took advantage of the resulting period of uncertainty, and the shares were mostly range-bound throughout 1999 (although those with the conviction to buy on dips did quite well).  Against the tide of a very weak market yesterday, LHSP reached a new 52-week high.

> We believe that sufficient time has passed for investors to begin regaining confidence and recognizing that the stock is significantly undervalued compared to its leadership position and huge market potential.
>
> **More Disclosure Should Boost Confidence in Estimates; Higher R&D May Trim EPS 10-12 Cents** - LHSP is a complex company, with many products, business units and end markets, and it has augmented its growth and consolidated its market position via numerous acquisitions.  The results have been impressive, with revenues growing by five fold, from about $100MM in 1997 to our 2000 estimate of slightly over $500MM.  However, it has not been easy for investors to understand all the moving parts.

(Am. Compl. ¶ 69).  According to Plaintiffs, that analysis report repeated false information regarding L&H's financial performance, including alleged customer contracts with the named Korean companies. That is so despite Cowen's supposed knowledge that L&H revenues attributable to Asian markets were fraudulent.

Plaintiffs claim that Cowen had inside knowledge where, in September 1999, it rendered a "fairness opinion" on the consideration to be paid by L&H to purchase Bumil Information & Communication Co. (later known as L&H Korea).  Cowen

> reviewed and considered such financial and other matters . . . including, among other things: (1) a draft of the Transaction Agreement, dated as of August 31, 1999, as amended as of September 3, 1999 . . . ; (ii) the Transaction Partner's [Bumil's] audited financial statements for the fiscal years ended December 31, 1996, 1997, and 1998, unaudited financial statements for the first two fiscal quarters ended June 30, 1999 and certain other relevant financial and operating data prepared by Transaction Partner [Bumil]; (iii) certain publicly available information for the Company [L&H], including

each of the annual reports of the Company filed on Form 20-F for each of the fiscal years ended December 31, 1996, 1997, and 1998, unaudited financial statements for the first two fiscal quarters ended June 30, 1999 filed on Form 6-K and certain other relevant financial and operating data furnished to SG Cowen by Company management; (iv) Wall Street analysts reports, including projections contained therein, for the Company (the "Company's Forecasts"); (v) certain internal financial analyses, financial forecasts, reports and other information concerning Transaction Partner prepared by the management of Transaction Partner as revised and adjusted by the management of the Company (the "Transaction Partner's Forecasts"); (vi) discussions we have had with certain members of the managements of each of the Company and Transaction Partner concerning the historical and current business operations, financial conditions and prospects of the Company and Transaction Partner and such other matters we deemed relevant; . . . and (xi) such other information, financial studies, analyses and investigations and such other factors that we deemed relevant for the purposes of this opinion.

(Am. Compl. ¶ 70).

On February 10, 2000, Cowen released another analyst report making a "Strong Buy" recommendation.  The recommendation stated, in relevant part:

**B4:99 Surge In Technology And Solutions, Asia Especially Strong**

**Strong Buy For New Target Of $95-100 In 12 Months**

**Revenue $110MM (+26% QQ) $8MM Above Our Estimate On Surge in Asia Business** - Total revenues grew 44% Y/Y, lead by 111% growth in Technology and Solutions, to $56.4 MM (51% of total).  The division signed a record of 80 contracts for the quarter, including numerous licenses for the new RealSpeak TTS engine and telephony applications in the Asia Pacific region.

(Am. Compl. ¶ 95).  That recommendation was premised on the reported 1999

L&H revenue, the "surge in Asian business," and the execution of "a record 80 contracts," especially in Asia.  (Am. Compl. ¶ 96).  Plaintiffs allege that the reported revenues were fraudulently overstated; there was no surge in L&H's Asian business; and many, if not most, of the supposed contracts either did not exist at all or were signed by dummy companies created by Defendants for the purpose of becoming L&H customers. (Id.).

In addition, Rob Stone of Cowen publicly defended L&H's customer list once the media began to question the validity of L&H's Asian revenues:

> I was in Korea in the middle of July and visited with a couple of the customers–two of the securities companies that are–that are mentioned in the list of names provided by the company.  I not only talked to the customers, but I physically saw the installations, saw the computers, saw the inbound phone lines lighting up in the call center, so I can say they're real.  Now I didn't go and visit every customer site that they have in Korea, of course not, but based on what I was able to see, I believe that it's a real operation.

(Am. Compl. ¶ 97 (quoting Transcript, CNBC Business Center interview, August 8, 2000)).

## ANALYSIS

**I.    Motion to Dismiss**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted only if it "appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim that would entitle him to relief."  In re

Cybershop.com Sec. Litig., 189 F. Supp.2d 214, 223 (D.N.J. 2002) (quoting

Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  When resolving a motion to

dismiss, a district court must accept all well-pleaded allegations in the complaint

as true, and view them in the light most favorable to the plaintiff.  Doug Grant,

Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183 (3d Cir. 2000).  However, the

court need not credit "bald assertions" or "legal conclusions."  Morse v. Lower

Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

## II.     Section 10(b) and Rule 10b-5 Claims

### A.     Relevant Law

To state a claim pursuant to Rule 10b-5, Plaintiff must allege that (1) the

defendant made a misrepresentation or omission of a material fact; (2) scienter

motivated the defendant's misrepresentation or omission; (3) the defendant made

the misrepresentation or omission in the context of a securities purchase or sale;

(4) the plaintiff relied upon defendant's misrepresentation or omission; and (5) the

plaintiff's reliance proximately caused damages.  In re Cybershop.com Sec. Litig.,

189 F. Supp. 2d at 224.  Scienter may be pled by alleging facts (1) that

demonstrate "'a motive and opportunity to commit fraud,'" or (2) that "constitute

circumstantial evidence of either reckless or conscious behavior."  In re Advanta

Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999) (quoting Weiner v. Quaker Oats Co., 129 F.3d 310, 318 n.8 (3d Cir. 1997)).

A plaintiff alleging false or misleading statements or omissions of material fact must meet the heightened pleading requirements of both Rule 9(b) and the PSLRA.  In re Cybershop.com, 189 F. Supp. 2d at 225.  Rule 9(b) requires that allegations of fraud, and the circumstances constituting the fraud, be pled with particularity.  Id.  While the particularity requirement may be relaxed where factual information is within defendant's knowledge or control, "boilerplate and conclusory allegations will not suffice."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997).

Federal Rule of Civil Procedure 9(b) demands that a plaintiff plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.  In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)).  Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission.  Id. (citing Klein v. General Nutrition Cos., Inc., 186 F.3d 338, 345 (3d Cir.1999)).  In short, "Rule 9(b)

-10-

requires, at a minimum, that plaintiffs support their allegations of securities fraud

with all of the essential factual background that would accompany 'the first

paragraph of any newspaper story'–that is, the 'who, what, when, where and how'

of the events at issue." Id. at 217 (quoting In re Burlington, 114 F.3d at 1422).

The PSLRA imposes another "layer of factual particularity" on allegations

of securities fraud. In re Rockefeller Center Properties, Inc. Secs. Litig., 311 F.3d

at 217-18.  Under the PSLRA, a complaint alleging a 10(b) violation is insufficient

unless it "specifies each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the

statement or omission is made on information and belief[,] . . . state[s] with

particularity all facts on which that belief is formed." In re Cybershop.com, 189 F.

Supp.2d  at 226 (citing 15 U.S.C. § 78u-4(b)(3)(A)).  All allegations of scienter

must be supported by facts stated "with particularity" and must give rise to a

"strong inference" of scienter. In re Advanta Corp. Sec. Litig., 180 F.3d at 535

(quoting 15 U.S.C. 78u-(b)(2)).[3]

Courts have permitted securities fraud plaintiffs to rely on the so-called

_____

[3]"[T]o the extent that Rule 9(b)'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' 15 U.S.C. § 78u-4(b)(2), the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'" In re Alpharma Inc. Sec. Litig., No. 02-3348, at *13 (3d Cir. June 15, 2004) (quoting In re Advanta, 180 F.3d at 531 n.5).

"fraud on the market" theory, which allows for a rebuttable presumption of reliance by the plaintiffs on an efficient market that reflects material information in the stock price.  In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir. 1996).  Short sellers, by definition, do not believe that the price of the stock accurately reflects such relevant information and, therefore, cannot benefit from the presumption of reliance.  Plaintiff short sellers are therefore required to allege actual reliance in that (1) the misrepresentation or fraudulent act raised the price of stock; (2) at the time of cover, plaintiff relied on the integrity of the market price of the stock; and (3) reliance on the stock's price at the time of cover was reasonable.  Zlotnick v. Tie Communications, 836 F.2d 818, 821-22 (3d Cir. 1988).  Reliance is adequately pled only where short sellers were unaware of any fraudulent activity by defendants at the time of cover.  See Jones v. Intelli-Check, Inc., 274 F. Supp.2d 615, 633 (D.N.J. 2003).  Phrased differently, reliance on the market price cannot be reasonable if plaintiffs had knowledge of fraud or misrepresentations at the time of cover.

## B.    Discussion

Cowen contends that the Amended Complaint is insufficient for failing to identify specific misstatements made by Cowen that were false when made, that Plaintiffs relied on those statements, and that Cowen acted with the requisite

scienter.

Cowen also argues that the Amended Complaint is fundamentally flawed for failing to allege in sufficient detail Rocker's short-selling activity, i.e., when and how many shares were sold at what price, and when and how many shares were purchased to cover short sales.  See Barr v. McCraw Hill, Inc., 710 F. Supp. 95, 97 (S.D.N.Y. 1989) (noting deficiencies in securities fraud complaint for failure to plead "the amount and price of the securities purchases by each plaintiff, the date and place of each purchase, and the losses suffered"); Morin v. Trupin, 747 F. Supp. 1051, 1062-63 (S.D.N.Y. 1990) (same).

The non-binding authority on which Cowen relies involves multiple-plaintiff scenarios that, absent more detailed allegations, hindered defendants from adequately defending themselves against the claims asserted by each plaintiff.  For example, there were over thirty-five plaintiffs in Morin and, among other deficiencies, the complaint was largely devoid of any details as to the individual circumstances of plaintiffs' investments and attendant losses.  747 F. Supp. at 1062 ("Mere participation in an unsuccessful investment program, in the absence of any alleged loss, is insufficient to state a claim.").  In Barr, the court expressly noted that more details of plaintiffs' purchases were required to enable defendants to prepare a defense against claims of the individual plaintiffs whose

circumstances may differ, in addition to supporting the amount of damages claimed.  710 F. Supp. at 97.  This case does not present the same difficulties and, of course, damages must ultimately be proven and quantified if there is to be any recovery by Plaintiffs.  The Amended Complaint sufficiently details the time period in which Plaintiffs built up short positions and ultimately made cover purchases, and alleges that substantial losses in the range of tens of millions of dollars resulted.  (Am. Compl. ¶ 6).

As to the misstatements, Cowen urges a disconnect in that Plaintiffs began to sell L&H stock short in June 1998 and yet Cowen is not alleged to have issued any public statements concerning L&H until September 1998.  The argument continues that Plaintiffs could not have relied on any Cowen statements in making their investment decision.  That argument is correct as far as it goes.  However, Plaintiffs allege that Cowen's issuance of buy recommendations helped drive up the L&H stock price such that they were forced to cover; Plaintiffs do not allege that Cowen's buy recommendations influenced them to sell short in the first place. While the Court agrees that Plaintiffs cannot have relied on Cowen's statements to initiate short sales, that is not what the Court understands Plaintiffs to be alleging in this case.

Cowen further argues that Plaintiffs do not allege what portion of the

January and February 2000 statements were false when made.  This argument is unavailing.  Plaintiffs allege, among other things, that the January 2000 recommendation contained false claims about supposed success in Asia, false estimates and reports of 1999 revenues, and false claims about Korean L&H customers that did not exist.  Similarly, the February 2000 statement claimed revenue and a surge in Asian business that are also alleged to be false.  It is also alleged that Rob Stone of Cowen publicly and knowingly vouched on television for the legitimacy of L&H's Korean operation by stating that the L&H customers were real, when, in fact, they were not legitimate.

Cowen also argues that its strong buy recommendations are basically nothing more than statements or expressions of optimism, which are not actionable.  Strong buy recommendations made by a sophisticated and well-known investment banker, backed by research and hard numbers, are precisely the type of information on which investors are expected to rely.  The Court will not simply write off these statements as mere puffery.  Judge Saris concluded as much when considering essentially the same conduct of Cowen.  See Bamberg v. SG Cowen, 236 F. Supp. 2d 79, 83-84 (D. Mass. 2002).

The Court concludes that the alleged misstatements attributable to Cowen are sufficient to trigger primary liability under Section 10(b).

*Scienter*

Cowen's primary argument for dismissal of the Amended Complaint is that the allegations are too sparse to support a strong inference that it knew, or was reckless in not knowing, that the alleged misstatements were false when made. The Court disagrees.

The allegations in the Amended Complaint against Cowen create a strong inference of scienter sufficient to withstand a motion to dismiss. Cowen is alleged to have had a close, long-standing, and lucrative relationship with L&H. Cowen served as an investment advisor for many L&H acquisitions, including Bumil, which later became its Korean subsidiary (Am. Compl. ¶ 275). In that capacity, Cowen reviewed

- Bumil's audited financial statements for 1996, 1997, and 1998;
- Bumil's unaudited financial statements for the first two quarters of 1999;
- "Relevant financial and operating data" prepared by Bumil; and
- Internal financial analyses, financial forecasts, reports and other information prepared by Bumil.

(Am. Compl. ¶ 70). Cowen also interviewed Korean management about business operations. (Id.). Review of such information gave Cowen intimate knowledge of L&H's Korean operations, including, among other things, information that Bumil operated at a net loss in the second quarter of 1999. (Am. Compl. ¶ 275).

-16-

Nevertheless, Cowen's Rob Stone publicly came to the defense of L&H in facing charges that Korean revenue was fabricated.  A few months later, $100 million dollars of revenue supposedly derived from Korean operations disappeared and the L&H Audit Committee recommended reversal of 1999 and 2000 Korean revenues due to the "speculative or start-up nature of many Korean customers." (Am. Compl. ¶ 94b-e).

The facts as alleged in the Amended Complaint with respect to Cowen are sufficient to create a strong inference of scienter.  Cowen allegedly made active attempts at covering up the fraudulent scheme after the scandal broke in the press. That a sophisticated entity like Cowen accepted the idea of skyrocketing Korean revenue to the incredible amount of $182 million, despite having intimate familiarity with Bumil's historic condition, is far-fetched.  That is so even allowing for the anticipated synergy between L&H and Bumil.  Further, Cowen was in possession of information regarding the geographic distribution of L&H's reported revenues for fiscal year 1999 and the first quarter 2000 at or about the time of a February 9, 2000 press release announcing record revenues.  However, Cowen failed to disclose that distribution in its February 10, 2000 "strong buy" recommendations.  That omission kept from investors the fact that L&H's traditional European and American markets were declining and highlighted the

show-stopping 1900% revenue growth in Asia.  (Am. Compl. ¶ 278).  That Cowen even issued a "strong buy" recommendation on those facts suggests scienter or at least reckless disregard of the truth.  Cowen also had a motive to participate in a fraud due to its long-standing, lucrative business relationship with L&H.  Its in-depth knowledge of the details of L&H Korean operations and the public attempts at fending off charges of fraud, coupled with its lucrative business relationship with L&H, combine to support a strong inference of scienter on Cowen's part.  Cf. Bamberg v. SG Cowen, 236 F. Supp. 2d at 82-84.

### *Reliance*

Next, Cowen argues that Plaintiffs have not sufficiently alleged the element of reliance for a Section 10(b) and Rule 10b-5 claim because Plaintiffs, as short sellers, acknowledged believing very early on that L&H was overvalued and that its technology was over-hyped.  The fact that Plaintiffs did not rely on any alleged misstatements in their decision to sell short, Cowen contends, is fatal to their Section 10(b) claims.

Plaintiffs counter that reliance is just one of many ways to establish the element of causation common to any tort claim.  Plaintiffs urge that a short seller's loss can just as readily be caused by a fraudulent scheme as a traditional investor's loss, provided the fraud caused the short seller to engage in the cover transaction.

Specifically, Plaintiffs argue that the fraudulent scheme's artificial inflation of the stock price after they had taken a substantial short position was the direct and proximate cause of Plaintiffs' decision to cover, thus satisfying the element of transaction causation.  Plaintiffs rely on Zlotnick v. Tie Communications, 836 F.2d at 824, where the Third Circuit held that a short seller can recover by showing that his decision to cover was connected with the fraud inasmuch as "[t]he rise may . . . have increased [the short seller's] risk of loss beyond acceptable levels, causing him to purchase.  It may have led him to conclude that the stock would take so long to decline in value that the cost of maintaining his short position would exceed his potential gain."  According to Plaintiffs, that is exactly what happened in this case.  Further, Plaintiffs maintain that while they had misgivings about certain publicly disclosed accounting practices at L&H, they had no knowledge about the fraudulent scheme of 1999 and 2000 sufficient to deprive their right to bring a fraud claim.

The Court concludes that Plaintiffs have sufficiently pled reliance under Zlotnick and should be permitted the opportunity to demonstrate that the fraudulently inflated price of L&H stock was a material factor in their decision to cover, insofar as the rise in stock price increased their risk of loss beyond acceptable levels, causing them to cover and incur substantial losses, or that the

fraudulently-induced price led them to conclude that the stock would take so long to decline in value that the cost of maintaining their short position would exceed their potential gain.  See Zlotnick, 836 F.2d at 824.  Plaintiffs have adequately alleged that, while they believed L&H stock to be overvalued, they had no knowledge of the ultimate fraudulent scheme that caused their losses at the time they made covering purchases.  (Am. Compl. ¶ 295).  Compare Jones, 274 F. Supp. 2d at 633 (dismissing securities fraud claims where plaintiffs had brought a fraud claim based on accounting methods of which they were plainly aware at all relevant times).

## III.    State Law Claims

In the final footnote of its opening brief, Cowen argues that Plaintiffs' state law claims should be dismissed for lack of subject-matter jurisdiction or, alternatively, for failure to allege any wrongdoing on the part of Cowen.  Having declined to dismiss the Section 10(b) claim against Cowen, the Court will not dismiss the state law claims asserted against it for lack of subject-matter jurisdiction.  Nor will the Court dismiss those claims for failure to allege wrongdoing on the part of Cowen.  Cowen concedes that the state law claims turn on the same wrongdoing as the Section 10(b) claims and, as already noted, the Court finds the allegations of wrongdoing on the part of Cowen sufficient to

withstand a motion to dismiss.

## <u>CONCLUSION</u>

For the foregoing reasons, Cowen's Motion to dismiss the Amended

Complaint will be denied.

Accordingly, **IT IS** on this 7th day of June 2005,

**ORDERED** that the Motion of Defendant SG Cowen Securities

Corporation to dismiss the Amended Complaint pursuant to Federal Rules of Civil

Procedure 12(b)(6) and 9(b) is denied.

/s/ John C. Lifland, U.S.D.J.