UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
ROCKER MANAGEMENT, L.L.C.          :
ET AL.,                            :
                                   :
          Plaintiffs,              :          CIVIL ACTION NO. 00-5965 (JCL)
                                   :
          v.                       :          **MEMORANDUM AND ORDER**
                                   :
LERNOUT & HAUSPIE SPEECH           :          (Lernout, Hauspie, and Bastiaens)
PRODUCTS N.V. ET AL.,              :
                                   :
          Defendants.              :
_____  :

## LIFLAND, District Judge

Plaintiffs Rocker Management, LLC, Rocker Partners, LP, Rocker Offshore

Management Company, Inc., and Compass Holdings Ltd. (collectively, "Rocker")

have asserted claims under Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17

C.F.R. § 240.10b-5, promulgated thereunder by the United States Securities and

Exchange Commission ("SEC"), against Defendants Jozef Lernout, Pol Hauspie,

Gaston Bastiaens, Carl Dammekens, Allan Forsey, Ellen Spooren, Erwin

Vandendriessche, Gerald Calabrese,[1] Klynveld Peat Marwick Goerdeler

Bedrijfsrevisoren (a/k/a KPMG Bedrijfsrevisoren or KPMG Belgium), KPMG

International ("KPMG"), KPMG UK, KPMG LLP, Paul Behets, and SG Cowen

_____

[1] Section 20(a) claims are asserted against only the individual defendants.

Securities Corporation ("Cowen") (collectively, "Defendants").[2]  Plaintiffs also bring state law claims for tortious interference with prospective economic advantage, conspiracy to tortiously interfere, and aiding and abetting tortious interference.

Before the Court are the Motions of individual defendants Jozef Lernout, Pol Hauspie, and Gaston Bastiaens ("Individual Defendants") to dismiss Counts I, II, V, VI, and VII of the First Amended Complaint and Jury Demand for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6), 9(b), and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1),(2) (the "PSLRA" or "Reform Act").[3]  For the reasons set forth below, these motions will be denied.

## FACTS

The facts are taken from Plaintiffs' 315-paragraph, 132-page Amended Complaint.  Lernout & Hauspie Speech Products N.V. ("L&H" or "the Company"), formed in 1987 by Jozef Lernout and Pol Hauspie, was a Belgian-

---

[2]A suggestion of death has been filed on behalf of Paul Behets.  In addition, the Court has been advised of a written and signed agreement to settle and release certain claims asserted against individual defendants Forsey, Spooren, Vandendriessche, and Calabrese.  The settlement is subject to certain conditions precedent, some of which have yet to occur.

[3]The Individual Defendants filed a joint brief in support of their motions to dismiss, as well as separate briefs addressing the allegations and claims that relate to each of them, specifically.  The Court has considered all arguments advanced in resolving the instant motions to dismiss the First Amended Complaint.

American company that specialized in speech recognition, text-to-speech conversion, and digital speech compressions.  (Am. Comp. ¶¶ 1, 12).  L&H's stock was traded on American and European exchanges.  Since its initial public offering in 1995, L&H reported rapid growth in its revenues due to its domination of its software market, its acquisition of other companies, and its development of revolutionary and "industry first" products.  (Am. Compl. ¶ 32).  Following public announcements in late 1999 and the first quarter of 2000 concerning both its reported revenues and its products, in addition to "strong buy" recommendations from L&H's investment banker, SG Cowen Securities Corporation ("Cowen"), and revenue compilations by its independent auditor, L&H's stock price rose from less than $19 in late November 1999 to a high of $72 in 2000–upwards of a 300% increase.  (Id. ¶¶2, 63).  The increase in stock price is alleged to be the result of a scheme of fraud and deception on the part of L&H–together with its related capital funds, officers and directors, accountants, and investment bankers.  The unveiling of that scheme in the latter half of 2000, due to investigative reporting by the Wall Street Journal, sent the stock price into a tailspin.  The exchanges then halted trading in the stock, and L&H sought refuge in bankruptcy proceedings.

Plaintiffs are hedge funds that, while also purchasing shares of stocks

believed to be likely to appreciate, identify and sell short[4] shares of stocks that

they believe to be likely to decline in price.  Beginning in June 1998, Plaintiffs

established and built short positions in L&H stock for essentially three reasons: (1)

L&H's senior management had a poor track record, having previously run another

technology company, Quarterdeck, into the ground based on an aggressive

growth-by-acquisition strategy that they appeared to be repeating at L&H; (2)

there was a limited market available for L&H's products; and (3) Rocker doubted

whether L&H had sound fundamentals for its business.  (Id. ¶ 100).

Plaintiffs charge that Defendants engaged in a scheme to squeeze[5] Plaintiffs

out of the L&H market by releasing fraudulent information to the market, causing

the price of L&H stock to double and triple from the prices at which Plaintiffs had

---

[4]A typical short seller expects a decline in price because, based on an assessment of the
underlying strengths and weaknesses of a company, it appears that the market has overvalued the
company's stock.  In a typical short sale, the "short seller" sells shares of a stock that he has
borrowed, and then must replace the borrowed shares with shares later purchased in what is
known as a "cover" transaction.  If the seller's initial assessment is correct, and the stock declines
in price, the short seller will make a profit based on the difference between the short-sale price
and the lower purchase price paid to cover.  Conversely, the short seller stands to lose money on
the transaction if the stock price increases.  (Am. Compl. ¶11; see generally Zlotnick v. Tie
Communications, 836 F.2d 818, 820-21 (3d Cir. 1988) (discussing nature of short selling as
investment strategy)).

[5]In a so-called "short squeeze," the price of a stock is inflated to levels at which the short
seller can no longer accept the costs associated with maintaining the short position, or at which
the risk of loss is increased beyond acceptable levels, forcing the short seller to "cover" his
position.  This has the dual effect of removing the short seller from the company's market and
further increasing demand for the company's stock, as the short seller must purchase the inflated
shares from the limited amount available in the public market.

sold short.  The inflation of the price of L&H stock squeezed Plaintiffs, forcing

them to reduce their net short positions through cover purchases at artificially high

prices, resulting in substantial realized losses in the tens of millions of dollars.

(Id. ¶ 5).

### A.    KPMG Certification of L&H's 1998 Financials

On April 9, 1999, KPMG Belgium published its Independent Auditor's

Report on L&H's financial statements for the year ending December 31, 1998.

(Id. ¶ 51).  KPMG Belgium allegedly made several false statements in those

certified financials.  First, financial statements falsely reported L&H's 1998

revenues.  KPMG Belgium itself withdrew its own certification in late 2000 and

disclosed to the investing public that its financial statements "should not be relied

upon."  (Id. ¶¶4, 123).  L&H's Audit Committee later acknowledged that the

statements inflated L&H's actual income by nearly $28 million (including by 24%

and 23% in the last two quarters of 1998, respectively).  Second, KPMG Belgium

represented that it conducted an "independent" audit, thereby indicating that it had

no financial interest or ties to L&H management.  In fact, the KPMG "global

account partner" for L&H who was responsible for overseeing the audit, Paul

Behets, took a position with an L&H-related entity shortly after overseeing and

certifying these falsified financials.  (Id. ¶ 267).  Third, KPMG Belgium

represented that it "conducted [its] audits in accordance with generally accepted auditing standards in the United States."  The financials violated many important aspects of United States generally accepted accounting principles ("U.S. GAAP"), involving the backdating of contracts, contracts entered into with related parties, and the existence of side agreements releasing customers of their obligation to pay.  (Id. ¶ 209-10).  Finally, KPMG Belgium represented that the financials were "free of material misstatement," and that the financials "present fairly, in all material respects, the financial position of Lernout & Hauspie Speech Products, N.V.," when, in fact, they falsely inflated L&H's revenue by almost $28 million. (Id. ¶ 52).

### B.   L&H's Press Releases and Cowen's "Strong Buy" Recommendations

On December 8, 1999, L&H issued a press release claiming that its Internet translation services were to be offered on a Microsoft website.  This press release falsely stated that this development represented an endorsement of L&H's translation product by Microsoft.  The press release quoted L&H's Chief Executive Officer, Gaston Bastiaens, as stating that "Microsoft's decision to offer our translation services . . . is a powerful statement . . . .[and] emphatic recognition of the outstanding quality, accuracy, and breadth of L&H's translation

capabilities." In fact, however, this decision was simply an advertisement for which L&H may have paid, and did not represent any sort of endorsement by Microsoft of L&H's product. Microsoft was actively looking for a buyer for its 7% stake in L&H. It is alleged that the false press release had the intended effect of pumping up the stock price given the power of a Microsoft imprimatur in the software industry: the stock climbed in the 20's in heavy trading following the December 8th press release. (Id. ¶¶ 55-63).

Later that month, on December 28, 1999, L&H issued a press release proclaiming the financial success of its Korean operation. L&H had previously acquired a Korean company, Bumil (an acquisition on which Cowen consulted and for which KPMG did due diligence), which subsequently operated as L&H's Korean subsidiary. The press release, which again quoted Bastiaens, stated that (1) L&H-Korea had closed "several deals with customers in the telecommunications, enterprise solutions, and embedded technologies markets"; (2) L&H experienced "strong demand" for its products in Asia; and (3) L&H had sold its software products to securities firms such as Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, and 10 other Asian securities firms. Later disclosures contradicted those claims of success in Asia; many of the companies identified in the press release denied being L&H

customers, there was no "strong demand" in Asia, and officials from both Samsung Securities and LG Securities denied ever having made any purchases from L&H.  In fact, L&H's own Audit Committee later recommended reversing every single dollar in L&H-Korea revenues because these "customers" and this "strong demand" did not exist.  (Id. ¶4a-e).  L&H's stock continued to trade in the mid-20s through late 1999 and early 2000.

On January 5, 2000, Cowen issued "strong buy" recommendations to the investing public.  (Id. ¶ 69).  Among other things, the report repeated that L&H had signed deals with Asian customers (i.e., Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, and Daewoo Securities).  Cowen's recommendation stated that L&H's revenue results were "impressive," rising "from about $100MM in 1997 to our 2000 estimate of slightly over $500MM."  It further states that L&H's "impressive" revenues would stop "endless short yammering in 1999."  (Id. ¶ 69).  Cowen presumably had knowledge to the contrary, given that, in September 1999, it had performed its own independent analysis of, among other things, financial and operating data, internal financial analyses and internal financial forecasts and reports relating to Bumil, as well as L&H financial and operating data provided by L&H to Cowen.  (Id. ¶ 70).

Shortly thereafter, on January 7, 2000, L&H filed a Form F-3 Registration

Statement with the SEC for the issuance of $150 million of common stock.  This

Registration Statement incorporated by reference KPMG Belgium's certification

of L&H's 1998 financial statements.  (Id. ¶ 4).  As indicated by KPMG Belgium's

later withdrawal and the Audit Committee restatement, the 1998 revenues were

falsely inflated by almost $28 million in improperly-recorded revenue.  (Id. ¶ 81).

On February 7, 2000, L&H issued a press release about a new "industry

first" technology demonstrated at a trade conference, i.e., a hand-held dictation

device that would allow the "user to 'listen' to e-mail summaries as well as full-

text email," and also issue computer commands by voice.  In fact, the device was

secretly hardwired to a personal computer for the demonstration.  (Id. ¶¶76-82).

In early 2000, more press releases issued boasting of L&H's massive

increases in revenue.  On February 9, 2000, the Company announced a stock split

following the reporting of "record" revenues.  That release indicated that L&H had

revenues of $110 million for the fourth quarter of 1999, a 43.5% increase over

fourth quarter 1998 revenue, and revenue of $344 million for the entire year of

1999, an increase of 62.7% over 1998 revenue.  (Id. ¶ 91).  The following day,

another "strong buy" recommendation issued from Cowen stating that L&H

realized $110 million in fourth quarter 1999 reported revenue, L&H booked "a

record 80 contracts for the quarter," and had a "surge in Asia business."  (Id. ¶ 95).

The record revenues for 1999 and the supposed surge in Asian business were fabricated.  L&H's Audit Committee later recommended the reversal of $182 million in L&H-Korea revenues.  (Id. ¶¶3, 94d, 125).  More than half of the revenue reported by L&H for 1999 was later reversed.  (Id. ¶ 94d).

From December 1999 through March 2000, the price of L&H stock rose to over $70 (split adjusted)–an increase of more than 300% from its early December 1999 trading price.  (Id. ¶ 102).

### C.    L&H's Falsification of Revenues

According to L&H's restated results for 1999, L&H earned $169.5 million that year–a decline of 20% from reported revenues of $211.6 million for 1998 and less than half of the $344.2 million L&H originally reported as 1999 revenue.  (Id. ¶259).  Plaintiffs allege that, despite its declining revenues, L&H created the false appearance of "record" revenues in a variety of ways.  First, L&H executed a "start-up" customer scam whereby, among other things, investment funds affiliated with L&H would create a "start-up" shell corporation, also often referred to as a "Language Development Company" or "LDC" that would receive an infusion of cash from the investment fund.  The start-up would sign a contract to pay L&H a so-called license fee that would then be reported on L&H's books as revenue.  To the extent that any money actually changed hands on these start-up

deals, the start-up paid L&H cash that originated with the L&H-related investment fund and, thus, the revenue was self-funded.  (Id. ¶¶ 85-88).  Second, L&H concealed the fact that its 1999 revenue in its traditional markets in Europe and the United States had declined by 20%, while the reported revenue in Asia rose by 1900%.  (Id. ¶ 94a).  Third, revenues attributed to Koscom ($5-10 million), Hung Chang ($5 million), Hyundai Securities ($5-10 million) and LG Securities were grossly overstated.  Other Asian customers were, in reality, L&H-related start-ups providing self-funded revenue, or, like Samsung Securities, were never L&H customers at all.  (Id. ¶94b-e).

The massive revenues supposedly realized in Asia were the result of so-called "factoring agreements" with Korean banks.  In a typical factoring agreement, a company assigns an account receivable on a customer contract to a bank, and the bank then provides the company with cash equivalent to the amount of the receivable.  If the factoring is with recourse, however, the company must repay the cash to the bank if the customer fails to pay the account receivable, and in this situation the factoring agreement is little different from a loan.  L&H's factoring agreements were, in fact, with recourse, and L&H would leave the money on deposit with the bank as security.  Nevertheless, L&H would recognize these de facto loans on its books as revenue.  In this manner, L&H was able to

create the illusion of revenue from its contracts with the shell, "start up" customers who were never going to pay L&H.  However, when the bank did not receive payment on the account receivable, the bank seized the cash deposit to make itself whole.  In this fashion, over $100 million in supposed L&H Korean "revenue" disappeared from the company's bank accounts.  (Id. ¶¶ 150-53).

As revealed by a report commissioned by L&H's own Audit Committee, L&H used the following accounting tricks to improperly record revenue: (1) booking revenue absent a contract; (2) booking revenue when collectibility was in doubt; (3) booking revenue on contingent contracts and/or prior to delivery; and (4) entering into side agreements with customers, which released them of their obligation to pay money to L&H.  (Id. ¶¶ 126-143).

In mid- to late-2000, investigative reporting by the Wall Street Journal caused defendants' fraudulent scheme to unravel.  L&H announced that it would refile financial statements for 1998, 1999, and the first half of 2000 due to "certain errors and irregularities."  In a May 2001 SEC filing, L&H announced that it was reversing $373 million of $535 million in revenue (70%) reported by L&H for 1998, 1999, and 2000.  (Id. ¶ 261).  Additionally, KPMG Belgium withdrew its audit report of L&H's 1998 and 1999 results, stating that its prior opinions "should no longer be relied upon."  (Id. ¶ 123).  The Audit Committee

recommended reversal of $27.9 million, $174.7 million and $119.1 million in previously reported revenue for 1998, 1999, and the first two quarters of 2000, respectively.  (Id. ¶ 259).

The impact on L&H was disastrous.  Senior executives of L&H, Gaston Bastiaens and Ellen Spooren, resigned and company co-founders Jo Lernout and Pol Hauspie were ejected from the board of directors.  L&H filed for bankruptcy court protection in both the United States and Belgium.  The SEC commenced investigation into the wrongdoings and criminal prosecutors in Belgium charged Bastiaens, Lernout, and Hauspie with stock-fraud and money-laundering, securing Bastiaens' extradition from the United States so that he could stand trial.

Plaintiffs allege that the Individual Defendants, as directors and officers of L&H, are liable as direct participants in the aforementioned conduct.  Count I of the First Amended Complaint alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Count II alleges that the Individual Defendants are "controlling persons" who are jointly liable for the corporate misconduct of L&H under Section 20(a) of the Exchange Act.  Counts III and IV do not apply to the Individual Defendants.  Count V alleges that the Individual Defendants tortiously interfered with Plaintiffs' prospective economic

-13-

advantage–i.e., their anticipated profit on short sales of L&H stock.  Count VI

alleges that Defendants conspired to tortiously interfere with Plaintiffs'

prospective economic advantage and to commit the various acts of misconduct set

forth in the other Counts.  Count VII alleges that Defendants aided and abetted

L&H's tortious interference with Plaintiffs' economic advantage, providing ample

assistance to the scheme to inflate the price of L&H stock.


## ANALYSIS

### I.      Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

should be granted only if it "appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim that would entitle him to relief."  In re

Cybershop.com Sec. Litig., 189 F. Supp.2d 214, 223 (D.N.J. 2002) (quoting

Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  When resolving a motion to

dismiss, a district court must accept all well-pleaded allegations in the complaint

as true, and view them in the light most favorable to the plaintiff.  Doug Grant,

Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 183 (3d Cir. 2000).  However, the

court need not credit "bald assertions" or "legal conclusions."  Morse v. Lower

Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

A.      **Section 10(b) and Rule 10b-5 Claims**

To state a claim pursuant to Rule 10b-5, Plaintiff must allege that (1) the

defendant made a misrepresentation or omission of a material fact; (2) scienter

motivated the defendant's misrepresentation or omission; (3) the defendant made

the misrepresentation or omission in the context of a securities purchase or sale;

(4) the plaintiff relied upon defendant's misrepresentation or omission; and (5) the

plaintiff's reliance proximately caused damages.  In re Cybershop.com Sec. Litig.,

189 F. Supp. 2d at 224.  Scienter may be pled by alleging facts (1) that

demonstrate "'a motive and opportunity to commit fraud,'" or (2) that "constitute

circumstantial evidence of either reckless or conscious behavior."  In re Advanta

Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999) (quoting Weiner v. Quaker

Oats Co., 129 F.3d 310, 318 n.8 (3d Cir. 1997)).

A plaintiff alleging false or misleading statements or omissions of material

fact must meet the heightened pleading requirements of both Rule 9(b) and the

PSLRA.  In re Cybershop.com, 189 F. Supp. 2d at 225.  Rule 9(b) requires that

allegations of fraud, and the circumstances constituting the fraud, be pled with

particularity.  Id.  While the particularity requirement may be relaxed where

factual information is within defendant's knowledge or control, "boilerplate and

conclusory allegations will not suffice."  In re Burlington Coat Factory Sec. Litig.,

-15-

114 F.3d 1410, 1418 (3d Cir. 1997).

Federal Rule of Civil Procedure 9(b) demands that a plaintiff plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.  In re Rockefeller Center Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)).  Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission.  Id. (citing Klein v. General Nutrition Cos., Inc., 186 F.3d 338, 345 (3d Cir.1999)).  In short, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'–that is, the 'who, what, when, where and how' of the events at issue."  Id. at 217 (quoting In re Burlington, 114 F.3d at 1422).

The PSLRA imposes an additional "layer of factual particularity" on allegations of securities fraud.  In re Rockefeller Center Properties, Inc. Secs. Litig., 311 F.3d at 217-18.  Under the PSLRA, a complaint alleging a 10(b) violation is insufficient unless it "specifies each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

-16-

allegation regarding the statement or omission is made on information and belief[,]
. . . state[s] with particularity all facts on which that belief is formed." In re
Cybershop.com, 189 F. Supp.2d at 226 (citing 15 U.S.C. § 78u-4(b)(3)(A)).  All
allegations of scienter must be supported by facts stated "with particularity" and
must give rise to a "strong inference" of scienter.  In re Advanta Corp. Sec. Litig.,
180 F.3d at 535 (quoting 15 U.S.C. 78u-(b)(2)).  "[T]o the extent that Rule 9(b)'s
allowance of general pleading with respect to mental state conflicts with the
PSLRA's requirement that plaintiffs 'state with particularity facts giving rise to a
strong inference that the defendant acted with the required state of mind,' 15
U.S.C. § 78u-4(b)(2), the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5
actions.'"  In re Alpharma Inc. Sec. Litig., No. 02-3348, at * 13 (3d Cir. June 15,
2004) (quoting In re Advanta, 180 F.3d at 531 n.5).

Courts have permitted securities fraud plaintiffs to rely on the so-called
"fraud on the market" theory, which allows for a rebuttable presumption of
reliance by the plaintiffs on an efficient market that reflects material information
in the stock price.  In re Westinghouse Sec. Litig., 90 F.3d 696, 710 (3d Cir.
1996).  Short sellers, by definition, do not believe that the price of the stock
accurately reflects such relevant information and, therefore, cannot benefit from
the presumption of reliance.  Plaintiff short sellers are therefore required to allege

-17-

actual reliance in that (1) the misrepresentation or fraudulent act raised the price of stock; (2) at the time of cover, plaintiff relied on the integrity of the market price of the stock; and (3) reliance on the stock's price at the time of cover was reasonable.  Zlotnick v. Tie Communications, 836 F.2d 818, 821-22 (3d Cir. 1988).  Reliance is adequately pled only where short sellers were unaware of any fraudulent activity by defendants at the time of cover.  See Jones v. Intelli-Check, Inc., 274 F. Supp.2d 615, 633 (D.N.J. 2003).  Phrased differently, reliance on the market price cannot be reasonable if plaintiffs had knowledge of fraud or misrepresentations at the time of cover.

### *Reliance*

The Individual Defendants jointly argue that Plaintiffs cannot sufficiently allege the element of reliance for a Section 10(b) and Rule 10b-5 claim given that Plaintiffs, as short sellers, acknowledge believing very early on that L&H was overvalued and that its technology was over-hyped.  The fact that Plaintiffs did not rely on any alleged misstatements in their decision to sell short, Defendants contend, is fatal to their Section 10(b) and Section 20(a) claims.  In addition, the Individual Defendants argue that Plaintiffs' state law claims of tortious interference and conspiracy to tortiously interfere should be dismissed for lack of subject matter jurisdiction or, alternatively, for failure to state a claim.

Plaintiffs counter that reliance is just one of many ways to establish the element of causation common to any tort claim.  Plaintiffs urge that a short seller's loss can just as readily be caused by a fraudulent scheme as a traditional investor's loss, provided the fraud caused the short seller to engage in the cover transaction. Specifically, Plaintiffs argue that the fraudulent scheme's artificial inflation of the stock price after they had taken a substantial short position was the direct and proximate cause of Plaintiffs' decision to cover, thus satisfying the element of transaction causation.  In making that argument, Plaintiffs rely on Zlotnick v. Tie Communications, 836 F.2d 818, 824 (3d Cir. 1988), where the Third Circuit held that a short seller can recover by showing that his decision to cover was connected with the fraud inasmuch as "[t]he rise may . . . have increased [the short seller's] risk of loss beyond acceptable levels, causing him to purchase.  It may have lead him to conclude that the stock would take so long to decline in value that the cost of maintaining his short position would exceed his potential gain."  According to Plaintiffs, that is exactly what happened in this case.  Further, Plaintiffs maintain that while they had misgivings about certain publicly disclosed accounting practices at L&H, they had no knowledge whatsoever about the fraudulent scheme of 1999 and 2000 so as to preclude their ability to prove reasonable reliance.

The Court concludes that Plaintiffs have sufficiently pled reliance under

<u>Zlotnick</u> and should be permitted the opportunity to demonstrate that the fraudulently inflated price of L&H stock was a material factor in their decision to cover insofar as the rise in stock price increased their risk of loss beyond acceptable levels, causing them to cover and incur substantial losses, or that the fraudulently-induced price led them to conclude that the stock would take so long to decline in value that the cost of maintaining their short position would exceed their potential gain.  <u>See</u> <u>Zlotnick</u>, 836 F.2d at 824.  Plaintiffs have adequately alleged that, while they believed L&H stock to be overvalued, they had no knowledge of the ultimate fraud that caused their losses at the time they made covering purchases.  <u>Compare</u> <u>Jones</u>, 274 F. Supp. 2d at 633 (dismissing securities fraud claims where plaintiffs had brought a fraud claim based on accounting methods of which they were plainly aware at all relevant times).

Next to be addressed are whether the factual allegations are sufficient to withstand a Motion to Dismiss as to each Individual Defendant.

### *Jozef Lernout*

Jozef Lernout, a co-founder of L&H, acted as Managing Director of the L&H Board since its organization in 1987, as President from January 1994 until October 1996, co-Chairman since October 1996, and as co-Chairman of the Office of the Chief Executive since 1996.  (Am. Compl. ¶ 14).  Lernout also served as a

director of the FLV Fund from 1996 to 1997.  Lernout resigned his management position with L&H on November 9, 2000.  (Id.).

Lernout allegedly played critical roles in orchestrating and implementing "start-up" customer scams, controlling several L&H-related investment funds used as a vehicle for the "start-up" scam, such as FLV Fund, Flanders Language Valley Foundation, and L&H Investment Company.  (Id. ¶¶ 14, 15, 274b).  According to a former L&H salesperson, it was "understood" that if FLV Fund invested $1 million in a start-up then L&H would receive "about $300,000" in license fees from that start-up.  (Id. ¶ 172).  In October 1999, FLV Fund invested $10 million in four Singapore start-ups, which promptly paid $8 million of that money to L&H.  (Id. ¶ 173).  As a condition for investing in a start-up, FLV Fund would demand that the start-up sign a contract to pay 20% of the investment to L&H as a "fee," with the understanding that the "fee" need never be paid–something that happened on at least 22 separate occasions.  (Id. ¶ 178).  These related-party "deals" accounted for 10% of L&H's revenue in 1998 and 25% of its 1999 revenues, without any disclosure to investors about related-party status.  (Id. ¶ 173).

Lernout signed the January 2000 Registration Statement that is alleged to have contained falsified 1998 financial figures.  (Am. Compl. ¶ 75).  In January

2000, Lernout received an e-mail informing him that revenue had been improperly recorded for the fourth quarter of 1999. (Id. ¶¶ 131-32). Another e-mail dated April 4, 2000 informed him that $8 million in supposed revenue for a customer contract had been improperly recorded in the first quarter of 2000, and that another customer had not made a purchase at all, but had instead simply requested information. (Id. ¶ 133). Lernout also allegedly actively participated in the Korean fraud by providing $25 million to L&H Korea to placate the banks who issued factoring agreements,[6] thereby prolonging the fraud. (Id. ¶¶158-60).

Lernout argues that other than signing a public filing incorporating by reference KPMG Belgium's certification of L&H's 1998 financial statements (Id. ¶¶ 73-75), none of the statements Plaintiffs allege to be false and misleading–financial statements and press releases–may be attributed to him. Lernout further argues that the Amended Complaint fails to plead facts giving rise to a "strong inference" that he acted with scienter concerning accounting irregularities, related-party transactions, and involvement with the Korean

---

[6]In a typical factoring agreement, a company assigns an account receivable on a customer contract to a bank, and the bank then provides the company with cash equivalents to the amount of the receivable. If the factoring is with recourse, however, the company must repay the cash to the bank if the customer fails to pay the account receivable, and in this situation the factoring agreement is little different from a loan. L&H's factoring agreements were with recourse, and L&H would leave the money on deposit with the bank as security. Nevertheless, L&H allegedly recognized the de facto loans on its book as revenue. (Am. Compl. ¶¶150-53).

subsidiary.  The mere fact that he signed the 2000 Registration Statement, Lernout contends, is insufficient to establish scienter and there are no additional facts suggesting that he had information that the statement was false.  Lernout also argues that there is no sufficient link between the two e-mails he received indicating that a contract had not been signed, (id. ¶ 131), and that a customer had requested certain information in order to finalize an agreement, (id. ¶ 133), and the erroneous financial statements.  The argument goes that awareness that a particular contract had not yet been signed provides no link as to whether revenue had been inappropriately recognized for that contract.

The Court concludes that the allegations against Lernout are sufficient both as to his making actionable misstatements and as to his acting with the requisite scienter.  Lernout signed the January 2000 Registration Statement, thus directly linking him to republication of the falsified financial results reported for the company for the calendar year 1998.  Those results were inflated by almost $28 million by virtue of the start-up customer scam and other schemes.  The Amended Complaint alleges Lernout's knowing participation in schemes contributing to the artificial inflation of the price of L&H stock in that he directed and influenced several investment funds to implement the start-up customer scam; that he knew of gross distortions in accounting for revenue and ignored such information; and that

he arranged for the $25 million payment to the head of L&H Korea as an "earn out" payment that he knew was used to placate Korean banks and thus fuel the factoring scheme. These allegations are sufficient to demonstrate the requisite scienter to survive a motion to dismiss.

### Pol Hauspie

Hauspie, a co-founder of L&H, served as Managing Director since its organization in 1987, Chairman from January 1994 until October 1996, and as co-Chairman of the Board since October 1996. Hauspie also served as a member of the Office of the Chief Executive since February 1996 and as co-Chairman of the Office since October 1996. (Am. Compl. ¶ 15). In addition, Hauspie served as a director of the FLV Fund from 1996 to 1997. (Id.) Hauspie resigned from his executive positions on November 9, 2000. (Id.). Thereafter, in January 2001, Belgian authorities charged Hauspie with "criminal money laundering." (Id.).

Hauspie, together with Lernout, allegedly orchestrated and implemented the aforementioned "start-up" customer scams, controlling several L&H-related investment funds used as a vehicle for the "start-up" scam such as FLV Fund, Flanders Language Valley Foundation, and L&H Investment Company. (Id. ¶¶ 14, 15, 274b). Hauspie was the director of FLV Fund's management arm until 1997. (Id. ¶ 167).

According to the report of L&H's Audit Committee, Hauspie directly participated in the fraudulent scheme to report false revenues by signing side letters with customers exempting them from their contractual payment obligations. (Id. ¶ 274b).  The Committee recommended that disciplinary action be taken against him.  (Id. ¶¶ 125, 274b).

Hauspie also signed the January 2000 Registration Statement.  (Id. ¶ 75).  In January 2000, he received e-mails informing him that revenue had been improperly recorded for the fourth quarter of 1999, (id. ¶¶ 131-32).  In April 2000, another email alerted him that $8 million in supposed revenue for a customer contract had been improperly recorded in the first quarter of 2000, and that another so-called customer had not made a purchase at all but had instead simply requested information.  (Id. ¶ 133).

Hauspie also allegedly participated in the Korean fraud by providing $25 million to L&H Korea to placate the banks who issued factoring agreements.  (Id. ¶¶158-60).

Hauspie argues that the Amended Complaint fails to meet the heightened pleading requirements of the PSLRA and Rule 9(b) both as to false or fraudulent statements and scienter.  Specifically, Hauspie contends that the Amended Complaint does not allege that he made any false statements, that he was directly

-25-

involved in creating the accounting statements, or that he engaged in any reckless conduct.  Hauspie further contends that Plaintiffs have failed to adequately allege motive or opportunity to commit fraud insofar as there are no allegations that he sold any L&H stock during the relevant time period.

The Court concludes that the allegations against Hauspie are sufficient both as to his making actionable misstatements and as to acting with the requisite scienter.  Hauspie is clearly linked to the January 2000 Registration Statement, having signed that document.  That statement repeated and republished the financial results reported for the company for the calendar year 1998.  Those results were inflated by almost $28 million by virtue of the start-up customer scam and other schemes with which Hauspie is directly linked.  Further, the allegations in the Amended Complaint are quite strong as to Hauspie's knowledge and participation in various schemes contributing to the artificial inflation of the price of L&H stock.  That Hauspie is not alleged to have sold any L&H stock during the relevant time does not matter.  It is alleged that Hauspie directed and influenced several investment funds used to implement the start-up customer scam; that he knew of gross distortions in accounting of revenue and apparently ignored such information; that he signed side agreements with particular start-up companies releasing them of contractual obligations under their license agreements; and that

he arranged for the $25 million payment to the head of L&H Korea as an "earn out" payment that he knew was used to placate Korean banks and thus fuel the factoring scheme. The allegations are sufficient to demonstrate the requisite scienter to survive a motion to dismiss.

### Gaston Bastiaens

Gaston Bastiaens joined L&H in October 1996 as President and became Chief Executive Officer in May 1997, serving in both posts until his resignation on August 25, 2000. (Am. Compl. ¶ 16). Bastiaens allegedly played a key role in orchestrating and directing the fraudulent scheme to artificially inflate the price of L&H's stock, (id. ¶ 16), and then sold his L&H stock options for over $900,000. Following his arrest by United States authorities, Bastiaens was extradited to Belgium to await trial before a Belgian criminal court on stock-fraud charges. (Id.). L&H's Audit Committee recommended "disciplinary action" against Bastiaens due to his misconduct.

Bastiaens allegedly authored, and was directly quoted in, press releases containing false and misleading financial information. Specifically, he wrote and was quoted in a December 8, 1999 press release claiming that L&H's Internet translation services were to be offered on a Microsoft website, despite his knowledge that the Microsoft "deal" did not represent any sort of endorsement of

L&H by Microsoft (id. ¶¶56-57); he drafted and was quoted in a December 28, 1999 press release touting supposed financial success of L&H's Korean operation, notwithstanding his knowledge that many of the "customers" claimed in Korea were not, in fact, bona fide customers (id. ¶¶ 66, 67); he signed the January 2000 Registration Statement, which reported inflated 1998 revenues (id. ¶ 75); he drafted a February 7, 2000 press release concerning dummied "industry-first handheld" devices; he drafted and was quoted in a February 9, 2000 press release, which falsely claimed that L&H had realized "record" revenues (id. ¶ 92); and he participated in the issuance of the false financial figures for 1998, 1999, and the first quarter of 2000 (id. ¶ 274c).

The following allegations in the Amended Complaint pertain specifically to Bastiaens:

- On July 26, 1999, Bastiaens received a "private and confidential" letter from KPMG advising him that the accounting practices at L&H were "leading to a mismatch between recognizing revenues and their associated costs in the correct time period. . . . ." (Id. ¶249);

- Likewise, another e-mail informed Bastiaens that $8 million in supposed revenue for a customer "contract" had been improperly recorded in the first quarter of 2000. In fact, the e-mail advised that there was no contract and no customer at all–to the contrary, the so-called "customer" had done nothing more than make an inquiry about L&H's products, and L&H's ultra-aggressive sales force had taken the liberty of booking $8 million in "revenue" from this supposed "customer." (Id. ¶ 133);

- In a September 1999 e-mail sent by the KPMG partner in Korea, Bastiaens was warned that "[i]t will be impossible for [L&H Korea] to uphold the internationally accepted accounting financial practices if they happen to be different from the current practices. . . ."  (Id. ¶ 144);

- Bastiaens actively participated in the Korean fraud by providing $25 million to L&H Korea to placate the banks who issued the factoring agreements, and thereby prolong the fraud.  In January 2000, Bastiaens recommended accelerating an "earn out" payment of $25 million to the former principal of Bumil (who was then heading L&H Korea), due to the subsidiary's purported success.  In fact, however, and according to a message sent by the Bumil principal to Lernout and Hauspie, the $25 million allowed him to "keep my promise to Korean banks and those banks will rely on L&H Korea and will help us much better than before."  (Id. ¶¶ 158-160);

- When the fraud in Korea first came to light in August 2000, Bastiaens appeared with Cowen's Rob Stone on CNBC's show Business Center.  During that appearance, Bastiaens claimed that the Wall Street Journal's report of dummied customers was "absolutely incorrect" because "[w]e have over 150 corporate customers."  (Id. ¶ 112).

Bastiaens argues that in addition to not adequately alleging the element of reliance in a securities fraud claim, the allegations against him do not meet the pleading requirements of the PSLRA and Rule 9(b) for the following reasons:

- failure to contain particularized allegations that Bastiaens was involved in the creation of the accounting at issue or knew any SEC filing or statement attributed to him in a press release was false;

- the Complaint asserts that KPMG audited all of the financial

-29-

statements addressed in the SEC filings or press releases at issue and KPMG had complete and unrestricted access to L&H books and records, giving KPMG unrestricted access to the Company;

- allegations that a defendant, because of his position as President of L&H for four years, "must have known" a statement was false do not meet the PSLRA's or Rule 9(b)'s pleading requirements;

- the Complaint recognizes that, just weeks before L&H's problems in Korea became known, Bastiaens bought L&H stock. Purchase of stock by a senior officer like Bastiaens creates an inference of the absence of fraud and thus can not help meet the pleading requirements of the PSLRA or Rule 9(b).

The Court is satisfied that the aforementioned allegations against Bastiaens are sufficiently particularized to withstand a motion to dismiss the Section 10(b) claim. Bastiaens, in his capacity as President and CEO of L&H, is directly tied to several misstatements: He allegedly drafted several false press releases, is quoted in those press releases, and signed the fraudulent January 2000 Registration Statement.

The Court is further persuaded that the allegations are sufficient to create a strong inference that Bastiaens acted with the requisite scienter. Bastiaens is alleged to have had actual knowledge of the fraud. In 1999, accountants and auditors informed Bastiaens about a "mismatch" between the booking of revenues and costs in the same period, and that it would be "impossible" for L&H Korea to

adhere to international accounting practices.  (Am. Compl. ¶¶ 144, 249).

Bastiaens' protestations that KPMG is at fault ring particularly hollow and, in any

event, the Court cannot credit Bastiaens' contradictory assertions on a motion to

dismiss.  Bastiaens also arranged for a $25 million payment to the head of L&H

Korea to fuel the factoring scheme, (id. ¶¶ 158-160), and in an alleged cover-up

claimed during a television interview that L&H Korea had over 150 customers.

(Id. ¶ 112).

 That Bastiaens allegedly purchased 625,000 shares of L&H stock in July

2000—just as the fraudulent scheme broke–does not necessarily negate an

inference of scienter on his part.  It is true that, in some instances, stock purchases

by a primary alleged wrongdoer can negate an inference of motive to defraud.

See, e.g., Maldonado v. Dominguez, 137 F.3d 1, 12, n.9 (1st Cir. 1998); Allison

and Sperber v. Brooktree Corp., 999 F. Supp. 1342, 1353 (S.D. Cal. 1998) (noting

that plaintiffs "have a particularly difficult task to demonstrate motive by means of

stock sales when the primary alleged wrongdoer was purchasing, and not selling,

stock").  However, that is not the case here.  The Complaint alleges that Bastiaens

bought the stock from an L&H-controlled investment fund for what amounted to

an "I owe you."  The Amended Complaint also alleges that Messrs. Lernout and

Hauspie, not Bastiaens, continued to vote those shares despite Bastiaens' supposed

purchase.  (Id. ¶ 114).

In sum, the Court concludes that the allegations against Bastiaens sufficiently allege that he acted with the requisite scienter for purposes of Section 10(b) liability.

### B.    Section 20(a) Claim

Count II of the Amended Complaint alleges that the Individual Defendants violated Section 20(a) of the Exchange Act.  15 U.S.C. §78t(a).  Under Section 20(a), a "controlling person" may be liable to an injured party under section 10(b) of the Exchange Act "to the same extent" as the corporation or other controlled entity.  In re Chambers Devel Sec. Litig., 848 F. Supp. 602, 618 (W.D. Pa. 1994). To state a claim under Section 20(a), plaintiffs must allege (1) a primary 10b-5 violation; (2) scienter; and (3) control of the primary violator.  J. Clark Poling v. K. Hovnanian Enterpr., 99 F. Supp. 2d 502, 514 (D.N.J. 2000).  Liability under Section 20(a) is predicated upon an independent violation of the Exchange Act.  In re Advanta, 180 F.3d at 541.

Having already determined that Plaintiffs have sufficiently alleged a primary 10b-5 violation and scienter as to Hauspie, Lernout, and Bastiaens, the Court will turn to whether Plaintiffs have adequately alleged the control element as to those individuals.  Control is defined as the "possession, direct or indirect, or

the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract or otherwise." 17 C.F.R. § 230.405.

It is argued that Plaintiffs have not adequately pled control over L&H insofar as there are no specific allegations of these individuals' significant degree of day-to-day operational control over L&H. The First Amended Complaint generally alleges that the "Individual Defendants, by reason of their stock ownership, directorships, and/or management positions, were controlling persons of L&H and had the power and influence to cause L&H to engage in the unlawful practices complained of herein." (Am. Compl. ¶ 270). Further, it is alleged that the "officers and directors of L&H, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, [were] directly involved in the day-to-day operations of the Company at the highest level, and [were] privy to confidential proprietary information concerning the Company and its business, operations, and accounting practices as alleged herein." (Id. ¶ 271).

While status or position alone do not constitute control for purposes of §20(a), see In re Cryomedical Sciences, Inc. Sec. Litig., 884 F. Supp. 1001, 1020 (D. Md. 1995), courts in this circuit have acknowledged that control person claims

need not be pleaded with particularity so long as the underlying Section 10(b)

violation is properly pled.  See Derensis v. Coopers & Lybrand Chartered

Accountants, 930 F. Supp. 1003, 1013 (D.N.J. 1996) (noting that there is an

"'overwhelming trend in this circuit to allow [S]ection 20(a) actions to withstand

Rule 9(b) motions based on a simple pleading of control'") (citation omitted).

Indeed, courts have found allegations very similar to those in the Amended

Complaint to be sufficient for control person liability.  E.g., In re Rent-Way Sec.

Litig., 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002); In re Campbell Soup Co. Sec.

Litig., 145 F. Supp. 2d 574, 599-600 (D.N.J. 2001).  In In re Rent-Way, the court

found control person liability adequately alleged and stated that

> each of the individual defendants had direct and supervisory
> involvement in the day-to-day operations of Rent-Way by virtue of
> their positions, ownership rights and contractual rights, and
> consequently that they had the power to influence and control the
> particular transactions giving rise to the alleged securities violations
> that are the basis of this action.  Each of these defendants is also
> alleged to have signed one or more statements filed with the SEC that
> were eventually restated, and to have had the ability to control the
> contents of these various statements.

209 F. Supp. 2d at 524.  Likewise, in In re Campbell Soup Co., the court found

control person liability sufficiently alleged upon the following facts:

> Defendant Morrison, as President and CEO, and Defendant
> Anderson, as Vice President and CFO, "directly participated in the

-34-

management of the Company, [were] directly involved in the day-to-day operations of the Company at the highest level, and [were] privy to confidential proprietary information concerning the Company and its business operations, [etc.] ... and were involved in drafting, producing, reviewing, approving, and/or disseminating" the allegedly misleading statements.

145 F. Supp. 2d at 599-600 (alterations in original).

The Court is satisfied that the allegations in the Amended Complaint concerning Lernout, Hauspie, and Bastiaens show that these individuals not only held high-level positions within the company, but had and exercised considerable control and influence over L&H operations.  Such allegations are sufficient to withstand a motion to dismiss claims concerning Section 20(a) control person liability.

**C.  Tortious Interference, Conspiracy, and Aiding and Abetting Claims**

The Court now turns to whether Plaintiffs have sufficiently alleged common law claims of tortious interference with prospective economic advantage, aiding and abetting, and conspiracy as to Lernout, Hauspie and Bastiaens.  A prima facie case of tortious interference with prospective economic advantage requires (1) a continuing or prospective economic advantage, (2) that defendant knew of such advantage, (3) that defendant interfered with that advantage "with malice," i.e., in

a manner "transgressive of generally accepted standards of common morality," and (4) that as a result of the interference, the plaintiff suffered injury.  Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 757 (1989).  Causation is satisfied if, had there been no interference, "there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits."  Id. at 759 (citation omitted); see also Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 186 (3d Cir. 1992).

The Individual Defendants argue that the claim for tortious interference with prospective economic advantage should be dismissed because Plaintiffs do not allege essential elements of their claim–namely, a prospective business relationship with a third party, that there was a "reasonable probability" that they would have received economic benefits from their short selling but for the alleged interference, and intentional interference with malice on the part of each Defendant.  It is further argued that the conspiracy and aiding/abetting claims must also be dismissed because each claim requires the existence of an underlying tort.  Finally, as to the conspiracy claim, Defendants argue that Plaintiffs have not alleged special damages, see Eli Lilly and Co. v. Roussel Corp., 23 F. Supp. 2d 460, 494 (D.N.J. 1998) (listing special damages as element of civil conspiracy claim).

The Court concludes that Plaintiffs should be permitted to test their common law claims during discovery.  Plaintiffs allege that they had a prospective economic advantage due to the profits anticipated from their short sales, as well as in their relationship with hedge fund investors, and that Defendants intentionally and with malice interfered with Plaintiffs' ability to secure that gain.  (Am. Compl. ¶¶ 307-09).  At this stage of the litigation, the Court is unable to assess the precise nature of Plaintiffs' short-sale and investor relationships and Defendants have not met their burden of demonstrating that it is beyond doubt that Plaintiffs cannot establish the requisite tripartite situation to proceed on the tortious interference claim.  See Eli Lilly and Co., 23 F. Supp. 2d at 494.

As to anticipated profits, the Amended Complaint alleges that "[b]y selling L&H stock short, Plaintiffs were in the pursuit of a reasonably certain, and protectable, economic gain due to the overvalued nature of that stock."  (Am. Compl. ¶ 307).  While short selling is a highly risky investment strategy, Plaintiffs have adequately alleged that they would probably have made a profit in this strategy.  See, e.g., Am. Compl. ¶¶ 5-6, 100.

It follows that the claims for conspiracy and aiding and abetting are not subject to dismissal for lack of an underlying tort.  See Landy v. FDIC, 486 F.2d 139, 162 (3d Cir. 1973) (noting that first element of aiding and abetting is "that an

independent wrong exist"); <u>Farris v. County of Camden</u>, 61 F. Supp. 2d 307, 330 (D.N.J. 1999) (dismissing claims for civil conspiracy to tortiously interfere because they were "dependent upon the viability of [the] substantive claims for tortious interference," which were dismissed); <u>Eli Lilly and Co.</u>, 23 F. Supp. 2d at 497 (holding that dismissal of underlying cause of action requires dismissal of conspiracy claim).

Finally, with no explanation or analysis, Individual Defendants argue that Plaintiffs have not alleged that they suffered any special damages as a result of the conspiracy. Given that Plaintiffs have pled tens of millions of dollars of damages, and that Individual Defendants devote nothing more than a passing reference to the notion that these alleged damages are somehow insufficient, the Court is not inclined to dismiss the conspiracy claim at this juncture.

Accordingly, **IT IS** on this 7th day of June 2005,

**ORDERED** that the Motions of Defendants Pol Hauspie, Jozef Lernout, and Gaston Bastiaens to dismiss Counts I (Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder) and II (Section 20(a) of the Exchange Act) pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) are denied; and it is further

**ORDERED** that the Motions of Defendants Pol Hauspie, Jozef Lernout, and Gaston Bastiaens to dismiss Counts V (Tortious Interference with Prospective Economic Advantage), VI (Conspiracy to Tortiously Interfere), and VII (Aiding and Abetting Tortious Interference) are denied.

/s/ John C. Lifland, U.S.D.J.