NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---

|  |  |
|---|---|
| ROCKER MANAGEMENT, LLC; ROCKER PARTNERS, L.P.; ROCKER OFFSHORE MANAGEMENT COMPANY, INC.; and COMPASS HOLDINGS, LTD., | Civil Action No. 00-5965 (PGS) |
| Plaintiffs, | **OPINION** |
| v. |  |
| LERNOUT & HAUSPIE SPEECH PRODUCTS N.V., FLANDERS LANGUAGE VALLEY FUND N.V.; JO LERNOUT; POL HAUSPIE; GASTON BASTIAENS; CARL DAMMEKENS; ALLAN FORSEY; ELLEN SPOOREN; ERWIN VANDENDRIESSCHE; KOEN BOWERS; GERALD CALABRESE; SG COWEN SECURITIES CORPORATION; KPMG BELGIUM; KPMG UK; KPMG LLC; PAUL BEHETS; CORPORATIONS A - Z; JOHN DOES 1 - 50, |  |
| Defendants. |  |

---

**SHERIDAN, U.S.D.J.**

In this matter, the plaintiffs,[1] Rocker Partners, L.P. and Compass Holdings, Ltd. (collectively

referred to as "Rocker" or "plaintiffs") have asserted claims under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5,

17 C.F.R. § 240.10b-5, promulgated thereunder by the United States Securities and Exchange

---

[1] David Rocker is a director and officer of Rocker. When referring to him personally, as opposed to the corporate entity, his full name is denoted.

Commission ("SEC"), against Defendants SG Cowen Securities Corporation ("Cowen") and a host of others (collectively referred to as "defendants").[2] Plaintiffs also bring state law claims for tortious interference with prospective economic advantage, conspiracy to tortiously interfere, and aiding and abetting tortious interference, which are not subject to this motion. Seven years into the case, with discovery nearly complete, defendant Cowen, joined by defendants KPMG Belgium and Bastiaens, filed the instant motion for summary judgment.[3]

## I.

Lernout & Hauspie Speech Products N.V. ("L&H" and sometimes "LHSP"), formed in 1987 by Jozef Lernout and Pol Hauspie, was a Belgian-American company that specialized in speech recognition, text-to-speech conversion, and digital speech compressions. L&H's stock was traded on American and European exchanges. Since its initial public offering in 1995, like other start-up technology companies driving the "dot com" craze, L&H reported rapid growth in its revenues due to domination of its software market, its acquisition of other companies, and its development of revolutionary and "industry first" products.

Rocker is a hedge fund that, in the regular course of its business, purchases shares of stocks which management believes are likely to appreciate, and also identifies and sells short shares of stocks that are likely to decline in price. This is a case about the latter – short selling. More

---

[2] On June 7, 2005, the claims of plaintiffs Rocker Management, LLC and Rocker Offshore Management Company, Inc. were dismissed for lack of standing. In addition, dismissal was granted to defendants KPMG UK and KPMG, LLC.

[3] With regard to this motion, the Court heard oral argument on April 17, 2007, but reserved on same until David Rocker was deposed. Subsequent to that deposition, supplemental briefs were submitted on the issue of reliance and the appropriate damage period. The Court further requested a month-by-month summary of transactions. These summaries were submitted on or about June 30, 2007.

specifically, Rocker engaged in extensive short selling of L&H stock between July 1998 and November 2000.  At all relevant times, Cowen was the underwriter, KMPG Belgium was the accountant to L&H, and Gaston Bastiaens was its chief executive officer.

Since short selling is at the heart of this controversy, it is worthwhile to describe this type of trading, as set forth by the Third Circuit.  Short selling:

> is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest.  At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price.  The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares.  In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock.  Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make this covering purchase; the short seller then pockets the difference.  On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to the stock's price, there is no limitation on the short seller's risk.  There is no time limit to this obligation to cover.

*Zlotnick v. TIE Communications*, 836 F.2d 818, 820 (3d Cir. 1988).

Generally, short selling is a legitimate market strategy used to "profit from an unexpected downward price movement to provide liquidity in response to unanticipated buyer demand, and to hedge a risk of a long position."  SEC, *Division of Market Regulation: Key Points About Regulation SHO* (April, 11, 2005).  On the other hand, a negative aspect of short selling is that a holder of a substantial short position may artificially devalue a stock.  Although short selling is a legitimate trading strategy, it is counterintuitive because the short seller is betting the stock will decline in value, whereas most investors take a long position and are looking for an increase in a stock's share price.  As noted above, short selling is generally considered a more risky strategy.  Moreover, it is

more difficult to determine a short seller's rights and liabilities using ordinary principles of securities law which were developed, for the most part, with long investors in mind. *See generally*, Douglas A. Smith, *Fraud on the Market: Short Sellers Reliance on Market Price Integrity*, 47 Wm. & Mary L. Rev. 1003 (2005).

Rocker initially identified L&H as a desirable company to short for several reasons based on information generally available to the ordinary investor.   First, L&H's senior management had a poor track record, having previously controlled another technology company, Quarterdeck, which collapsed because of an aggressive growth-by-acquisition strategy.   This appeared to be repeating itself at L&H.   Second, there was a limited market available for L&H's products.   Third, Rocker doubted whether L&H had sound fundamentals for its business.   In addition, Rocker questioned the reliability of L&H's products based on the personal experience of one of its general partners, Marc Cohodes.   Evidently, in early 1998, Cohodes researched the stock because his son suffers from cerebral palsy, and L&H's speech recognition technology may have been useful in his son's treatment.   Soon thereafter, Cohodes realized that the products offered by L&H did not function as represented and he informed his employer (Rocker).   On July 24, 1998, Rocker acquired its initial short position of 75,000 shares in L&H, and by the end of the third quarter accumulated between 452,100 and 452,800 short positions.[4]

Thereafter, in January 1999, David Rocker became suspicious, if not aware, that L&H had been engaged in related party transactions that falsely boosted sales results.   David Rocker deduced that a significant part of L&H's transactions may not have been at arms length because much of

---

[4]  The number of short positions held and the number of covering purchases are hotly disputed.  Due to this disparity, the range of short positions held and covered at different times as proffered by the parties is set forth.

L&H's growth was by corporate acquisitions, and a large portion of revenue was derived from transactions with these later-acquired corporations. Rocker spotted such transactions between Brussels Translation Group ("BTG") and L&H. BTG was a company established by some venture capitalists to develop machine translation software. In late January 1999, David Rocker e-mailed Marc Cohodes about this issue. According to David Rocker, L&H was "all a circular flow of money...lernout...to investment fund [referring to BTG]...lhspf...to lernout so the entire related party nonsense is becoming their entire story." By the end of January 1999, Rocker had increased its short position to between approximately 1,135,700 and 1,136,400 shares.

At some point, in the spring of 1999, Rocker changed its purely passive acquisition of short positions into a campaign to expose the alleged fraudulent activities of L&H.[5] On April 6, 1999, David Rocker e-mailed Robert Smithson of Goldman Sachs, in which he concludes that "LHSP's earnings have been and continue to be bogus." Later that same month, with between 1,392,100 and 1,550,900 short positions, Cohodes, in an e-mail to a reporter at TheStreet.com, called L&H "the fraud of all frauds." Again, on June 22, 1999, David Rocker attempted to shed public light on L&H's true financial status by generating a newspaper report. David Rocker forwarded a memo to Alan Abelson of Baron's characterizing L&H as "one of the biggest scams I have seen in many years. For this company to have 2 ½ billion market cap is absurd." Holding between 1,505,900 and 1,656,800 short positions, on June 30, 1999, David Rocker informed David Farber, a business reporter at CNBC, regarding related party transactions, that:

---

[5] Although not expressed in the record, it is generally acknowledged that a stock price reacts to negative press and/or analyst reports which often precipitate a stock price to tumble. Most likely, this was Rocker's objective in order to maximize a gain on its short position.

> LHSP is a bigger sham than Baan.[6]  There is a CIRCULAR FLOW
> OF MONEY between it and a number of ostensibly unrelated
> companies including Brussels Translation (BT) which was acquired
> yesterday. (emphasis in original).

Having little success with news reporters, the next day, David Rocker changed course, and

petitioned regulators to take action.  He wrote to Richard Sauer at the SEC, declaring that:

> in the 15 years I have been running this fund, never have I seen such
> flagrant and obvious financial manipulation...I urge you to act swiftly
> to end this charade.

On July 19, 1999, David Rocker got some press.  In a comment in Baron's magazine, David Rocker

again charged that "L&H's revenues are overstated and through arrangements with related parties

R&D expenses are deflected from L&H's income statement."  Unfortunately for Rocker, holding

between 1,461,800 and 1,733,500 shares short, its assertion seemingly had no impact on the market.

Having failed to garner the necessary support from either news reporters or regulators, David

Rocker turned to stock analysts in his effort to negatively impact L&H's stock price.  In an e-mail,

dated September 16, 1999, concerning a deal between L&H and BTG, David Rocker suggested to

Mairi Johnson, an analyst at Lehman Brothers, that "[t]he problem with BTG is not a violation of

MATCHING but rather of complete CONVERSION.  THIS IS NOT A CASE OF THEIR TAKING

IN EARNINGS EARLIER THAN THEY SHOULD HAVE BUT RATHER TAKING INTO

EARNINGS ITEMS WHICH REALLY WERE EXPENSES." (emphasis in original).  That same

day, Chris Bonomo, an investment fund advisor at Rocker confirmed to David Rocker, "I spoke to

---

[6]  The reference to Baan likely refers to the software firm that had been accused of
misleading investors and led the firm's collapse after an accounting scandal in 1998 and
precipitated a class action lawsuit that was resolved through an approved class settlement
agreement.  *See In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117 (D.D.C. 2003); *In re Baan Co.
Sec. Litig.*, 288 F. Supp. 2d 14 (D.D.C. 2003).

LEHMAN analyst last night  – she put in her note but still doesn't get that this isnt [sic] a timing issue it is a fabrication." (emphasis in original).  On September 17, 1999, David Rocker e-mailed David Faber at CNBC once again stating, in part, "sorry to burden you, but this fraud is documentable."

On September 21, 1999, David Rocker faxed to Robert Smithson, at Goldman Sachs, his analysis of the L&H and BTG deal.  He commented:

> ...(LHSP) bought [BTG] yesterday for $59 M...[BTG], like dictation consortium, a similar deal done last year, was set up to essentially hide [L&H's] research costs while creating illusory revenues for [L&H]...this is a shell game.
>
> ***
>
> That LHSP is a complete scam is now even more evident upon examination of their 6K which was recently filed.  The details are outlined in the enclosed.  In essence the company through using its created vehicle, Brussels Translation Group (BTG) created illusory earnings for the company, avoided expense recognition and as a result of purchasing BT created a phony asset.

In an attached memo, Rocker concludes, "[w]e believe Lernout & Hauspie's (LHSP) reported financials materially misrepresent reality.  It has systematically overstated revenues, capitalized expenses and utilized arrangements with related parties to prevent normal R&D expenses from being reflected in their income statements.  LHSP's recent acquisition of Brussels Translation Group (BTG) is a classic example."

Several days later, on September 26, 1999, after receiving information about L&H from Lehman Brothers, David Rocker e-mailed Brian Skiba , a Lehman analyst, stating: "your memo [is] helpful in pointing out the BTG profits but, with all due respect, this is not a matching issue.  It is the creation of ILLUSORY profits from EXPENSES.  It is not a timing issue, there are no profits.

This is a sham – you know it." (emphasis in original). At the end of September 1999, Rocker's short positions declined slightly to a range of between 1,303,600 and 1,565,257 shares.

On December 28, 1999, L&H issued a press release proclaiming unprecedented success of its Korean operation. Evidently, L&H had previously acquired a Korean company, Bumil, which subsequently operated as L&H's Korean subsidiary. In the press release, Gaston Bastiaens, L&H's CEO, stated that (1) L&H-Korea had closed "several deals with customers in the telecommunications, enterprise solutions, and embedded technologies markets"; (2) L&H experienced "strong demand" for its products in Asia; and (3) L&H had sold its software products to securities firms such as Hyundai Securities, Samsung Securities, LG Securities, Daishin Securities, Daewoo Securities, and ten other prominent Asian securities firms. On this news, L&H's stock price soared from $38 per share on November 30, 1999 to $48 per share on December 31, 1999. At the end of December 1999, Rocker held between 1,187,100 and 1,196,300, despite covering purchases of between 560,457 and 1,158,257 shares.

During January 2000, when L&H's stock price was about $47 per share, David Rocker continued his pursuit to expose L&H as a sham. On January 10, 2000, Rocker communicated with Lynn Turner, chief accountant of the SEC. In that e-mail he concluded that L&H's revenues and earnings were "grossly overstated." He wrote "I would like again to draw your attention to [L&H], which we believe has grossly overstated both revenues and earnings." On January 19, 2000, Cohodes received an email concerning L&H's Korean operations from Chris Bonomo. The e-mail expressed skepticism of the Korean results which had powered the dramatic rise in share price. The e-mail provided:

> LHSP filed a document with the SEC . . . came up on disclosure today. It's financials for the nine months ended 9/30/99. One of the interesting things you can find in this document is a breakdown of sales by geography. Here's what it says . . . 9 months ended 9/09 0/99 % change - United States 54.2MM 60.4MM + 11.5% - - europe, other 76.6 MM 86.5MM + 13.035% - - far east 4.2 MM 87.3MM + 1,978.4% ---- 134.9MM 234.2MM + 3.6% What's the deal with the far east!?!?!?!?

On January 27, 2000, David Rocker requested Arthur Levitt, Chair of the SEC, to review the accounting practices of L&H:

> We have sent under separate cover an extensive body of materials relating to Lernout & Hauspie (LHSP), which is one of the most flagrant accounting abusers I have come across in 30 years in this business.

By the end of January 2000, Rocker held between 828,100 and 959,800 shares short even though it had covered somewhere between 412,700 and 535,200 positions.

In February 2000, Cowen presented the fourth quarter 1999 results of L&H, which were spectacular. On February 10, 2000, Cowen issued a "strong buy" recommendation. Cowen asserted that L&H realized $110 million in fourth quarter 1999 reported revenue, booked "a record 80 contracts for the quarter," and had a "surge in Asia business." These results ignited a flurry of activity within the Rocker organization. Immediately following the issuance of L&H's quarterly results, on February 16, 2000, David Rocker forwarded the analysis of L&H's Far East sales to Skiba at Lehman Brothers. Meanwhile, Cohodes, on that same day, e-mailed Richard Sauer, in the Division of Enforcement at the SEC, alerting the Commission of L&H's faulty quarterly financials, stating:

> [L&H] printed their quarter last night...the most made up quarter yet...what details do you want/need? The entire business gain in korea [sic] and not quantifiable by them...Furthermore they are

9

> throwing operating expenses into goodwill, and capitalizing software
> costs on products that are currently selling...The stock is 80 on all this
> hype and made up stories...this is getting a touch over the top and
> needs attention.

In a February 11, 2000 e-mail to a researcher at AT&T Labs, Inc., who develop text-to-speech software and is likely knowledgeable of the industry, Cohodes recounted that he had "spent years tracking down [L&H's] various scams, and knows the company is a complete and utter fraud."

On February 13, 2000, in an e-mail to a former L&H investor, Cohodes stated, in reference to the Far East sales, that "the numbers are made up and the truth will come out."  That same day, David Rocker again e-mailed Skiba at Lehman Brothers declaring that "the korean business is a sham" and that "one would have to assume that [L&H] in the last 3 weeks of December did more business in Korea than it did in Europe for the entire quarter for their numbers to be accurate."

In February 2000, with Rocker holding between 256,500 and 799,200 short positions,[7] L&H's public announcements in late 1999 and Cowen's "strong buy" recommendation in February 2000 caused L&H's stock price to rise from approximately $37.94 in Early December 1999, to $116.88 by Early March, 2000 (with a high of $121.25) – upwards of a 300% increase.

In March 2000, Rocker's assault on L&H continued.  In a letter to the SEC dated March 8, 2000, David Rocker characterized L&H as "one of the most flagrant accounting abusers I have seen in quite some time."  At the end of March 2000, Rocker held between 414,865 and 977,565 short positions.

---

[7] As the Court understands the submissions, Cowen and Rocker presented two diametrically opposed views as to Rocker's activity in L&H securities during this month.  Cowen alleges Rocker acquired 1,189,000 short positions and covered 1,349,600 while Rocker does not acknowledge acquiring any short positions, but covered 792,500.

During the months of March and April, 2000, L&H had more positive news.  In April, it acquired Dictaphone and Dragon Industries; and in May 2000, L&H effected a two-for-one stock split.  As a result, at the end of May, Rocker held between 497,265 and 2,207,430 short positions.[8]

On August 8, 2000, L&H's fortunes reversed.  On that date, the Wall Street Journal ("WSJ") published a report exposing L&H's sales numbers in Korea as "discrepancies which undermine the credibility" of L&H.  According to the article, L&H had negligible Korean sales in early 1999, but they jumped to 42% of L&H's revenues by year end and "surged again" in the first quarter of 2000.  Upon investigation of the sales performance, the WSJ found that many of L&H's purported customers either were not customers or the volume of business was significantly less.  The story directly attacked the late December 1999 press release of L&H wherein it stated that Samsung Securities along with fourteen other firms had "selected L&H to develop client server solutions." According to the WSJ report, Samsung denied that it ever made any purchases from L&H.  In another instance, L&H asserted revenues of between $5 and $10 million with Hyundai Securities and Havit Bank when in reality the purchases were approximately $1 million.  At the end of August, 2000, Rocker held between 632,115 and 1,696,530 short positions.  Over the next several months, recognizing that the winds were changing for L&H, Rocker increased substantially its short position.

In September 2000, the SEC instituted an investigation which ultimately led to L&H admitting to "errors and irregularities" in its figures and postponing publication of an independent audit in November 2000.  L&H also announced it would re-file financial statements for 1998, 1999, and the first half of 2000, setting off a selling frenzy.  By the end of November, with Rocker still

---

[8] It appears that the 477,265 figure submitted by Rocker does not consider the stock split but defendant's figures do.

holding between 1,065,175 and 2,130,329 short positions, trading had been suspended and L&H was delisted by NASDAQ.

In a May, 2001 SEC filing, L&H announced that it was reversing $373 million of $535 million in revenue (70%) reported by L&H for 1998, 1999, and 2000.  Additionally, KPMG Belgium withdrew its audit report of L&H's 1998 and 1999 results, stating that its prior opinions "should no longer be relied upon."

David Rocker, according to defendants, is a "known short sale guy" in the industry.  He may indiscriminately use the buzzword "fraud" to describe the activities of companies in which he holds short positions due to his obvious self-interest in seeing the stock price decline.  His adamant, colorful language in the communications described above may be nothing more than conjecture or guesswork, rather than facts known to Rocker at the time.  It is obvious that from April, 1999 through August, 2000, regulators, reporters, and analysts were skeptical because they gave little credence to Rocker's assertions during this time frame.

As it turned out, Rocker's accusations proved correct.[9]  According to L&H's restated results for 1999, L&H earned $169.5 million that year – a decline of 20% from reported revenues of $211.6 million for 1998 and less than half of the $344.2 million L&H originally reported as 1999 revenue.  It is largely undisputed that L&H created the false appearance of "record" revenues.  One financial device L&H employed was a "start-up" customer scam whereby investment funds affiliated with

---

[9]  It is unknown why it took market participants so long to pick up on Rocker's tips, but hedge funds do not enjoy the best reputation.  Hedge funds, generally, have been pejoratively likened to "gunslingers sitting at a trading table" and "gunslinging risk-takers."  *See,* Mitchell Pacelle, *Hedge-Fund Managers Sought to Regain Investor Trust in 1999*, The Wall Street Journal, January 3, 2000, at R8; Ken Brown, *Hedge Funds' Heat Generate Allure for Mutual-Fund Firms*, The Wall Street Journal, August 7, 2000, at R1.

L&H would "start-up" a shell corporation that would receive an infusion of cash from the affiliated investment fund. The start-up would sign a contract to pay L&H a so-called license fee that would then be reported on L&H's books as revenue. To the extent that any money actually changed hands, the start-up paid L&H with cash that originated from the L&H-related investment fund; thus, the revenue was self-funded.

Additionally, the massive revenues supposedly realized in Asia were the result of so-called "factoring agreements" with Korean banks. In a typical factoring agreement, a company assigns an account receivable on a customer contract to a bank, and the bank then provides the company with cash equivalent to the amount of the receivable. If the factoring is with recourse, however, the company must repay the cash to the bank if the customer fails to pay the account receivable, and as such, the factoring agreement is little different from a loan. L&H's factoring agreements were with recourse, and L&H would leave the money on deposit with the bank as security. Nevertheless, L&H would recognize these de facto loans on its books as revenue. In this manner, L&H created the illusion of revenue from these contracts, knowing these arrangements would never pay L&H. However, when the bank did not receive payment on the account receivable, the bank seized the cash deposit to make itself whole. In this fashion, over $100 million in supposed L&H Korean "revenue" disappeared from the company's bank accounts.

## II.

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See id.* at 248.  The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  *See Celotex v. Catrett*, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To survive a motion for summary judgment, a non-movant must present more than a mere scintilla of evidence in his favor. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001).  The material fact or facts become genuine when a reasonable trier of fact could render a verdict for the non-moving party.  *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098 (1989).

At the summary judgment stage, the court's function is not to weight the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002).

As previously noted, this case concerns claims under Sections 10(b) of the Exchange Act and Rule 10b-5.  The Supreme Court recently stated:

> In cases involving publicly traded securities and purchases or sales in
> public securities markets, the action's basic elements include: (1) a
> material misrepresentation (or omission); (2) scienter, i.e., a wrongful

> state of mind; (3) a connection with the purchase or sale of a security;
> (4) reliance, often referred to in cases involving public securities
> markets (fraud-on-the-market cases) as 'transaction causation,' *see
> Basic* [*Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988)]
> (nonconclusively presuming that the price of a publicly traded share
> reflects a material misrepresentation and that plaintiffs have relied
> upon that misrepresentation as long as they would not have bought
> the share in the absence); (5) economic loss; and (6) 'loss causation,'
> i.e., a causal connection between the material misrepresentation and
> the loss.

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Defendants' motion for summary

judgment is grounded in the fourth and fifth elements of the cause of action.  More specifically,

defendants contend that plaintiffs' alleged knowledge of the fraud, as a matter of law, precludes a

finding of reliance.  Moreover, even if the Court were to accept that plaintiffs have shown reliance,

defendants maintain that plaintiffs sustained no damages when their losses are offset by gains within

the damage period.  Obviously, the plaintiffs disagree.  The Court discusses each issue below.  With

regard to reliance, both parties argue that the seminal case of *Zlotnick v. TIE Communications*, 836

F.2d 818 (3d Cir. 1988) is controlling.  The Court's analysis starts there.

III.

In *Zlotnick*, Albert Zlotnick, in January 1983, sold short 2,000 shares of Technicom stock

"because he concluded that the stock was overvalued."  *Id.* at 819.  Technicom's controlling

shareholders later issued several misleading press releases that artificially inflated the stock's price.

*Id.*  By March of 1983, Zlotnick, with no knowledge of any fraudulent activity, decided to cut his

losses by covering his short sales at the inflated price.  *Id.*  Though Zlotnick lost about $35,000, he

would have gained approximately $12,000 if he had waited until June 1983 to cover when

Technicom released more realistic earnings estimates.  *Id.*  The district court concluded that Zlotnick

15

"had not sufficiently alleged reliance on [Technicom's] deception" and dismissed the Complaint. *Id.* at 820.

On appeal, Zlotnick argued that the district court should have presumed reliance based on the fraud on the market theory.  *Id.* at 821.  Zlotnick argued the Third Circuit had previously endorsed this presumption with regard to ordinary investors, and there was no reason to treat short sellers differently.  *See Peil v. Speiser*, 806 F.2d 1154, 1161 (3d Cir. 1986).[10]

In order to resolve *Zlotnick*, the Third Circuit reviewed the underpinnings of its rationale for the fraud on the market presumption to determine whether it is applicable to short sellers.  In broad terms, the Third Circuit held the presumption does not apply to short sellers;[11] but, unlike the district court which dismissed the case, ruled that a short seller should be allowed to prove actual reliance through presentation of evidence.  *Id.* at 824.  Moreover, the court set forth a "roadmap" of how a short seller may satisfy his burden of proof to show reliance in absence of the fraud on the market presumption.  In more specific terms, the *Zlotnick* court initially reviewed the fraud on the market

---

[10]     The Supreme Court relied heavily on *Peil* when it recognized the fraud on the market presumption.  *See Basic v. Levinson*, 485 U.S. 224, 242, 244, 247 n. 25. (1988).

[11]     *Zlotnick* has caused considerable controversy among the circuit courts and legal scholars, mainly regarding whether a short seller should be entitled to a presumption.  *See* John A. MacKerron, *The Price Integrity Cause of Action Under Rule 10(b)(5): Limiting and Expanding the Use of the Fraud on the Market Theory*, 69 Or.  L.  Rev. 177, 208 (1990).  Today, some 19 years after deciding *Zlotnick*, the debate is still brewing.  Commentators have striven "to resolve the split among the federal district courts, and to discern whether *Zlotnick* was correctly decided."  Smith*, supra*, 47 Wm. & Mary L. Rev. at 1008-09.  Even within the Circuit, there are seemingly varying opinions about the efficacy of *Zlotnick*.  *Compare Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp.2d 666 (E.D. Pa. 2004), *with Jones v. Intelli-Check, Inc.*, 274 F. Supp.2d 615 (D.N.J. 2003).  Neither party here argues that the short seller is entitled to a presumption of reliance.

presumption.  Describing it as a "theory of indirect actual reliance," the court noted that the theory is composed of three separate presumptions.  The court penned:

> [t]he fraud-on-the-market theory creates a threefold presumption of indirect reliance.  First, this court presumes that the misrepresentation affected the market price.  Second, it presumes that a purchaser did in fact rely on the price of the stock as indicative of its value.  Third, it presumes the reasonableness of that reliance.  All of these presumptions are necessary to establish actual reliance.

*Id.* at 822.  The court found that it would be illogical to make any of these presumptions given the facts presented.  *Id.*  Zlotnick believed that the market overvalued Technicom stock and, thus, his actions could not be reconciled with the fraud on the market theory's requirement that the stock is being traded on an efficient market that incorporates all available information into price.  *Id.* at 822-23.  However, this does not mean that the short seller is barred from demonstrating that he relied on a fraud on the market through actual proof of each of the components of the presumption.  In other words, a short seller must prove all three elements (or presumptions) in order to establish reliance.  Hence, pursuant to *Zlotnick*, a short seller must show three elements to prove reliance: (a) defendant misrepresented relevant facts which effected the market including price of the stock; (b) the short seller relied on the market in the future to correct the stock price but the misrepresentations interfered with same; and (c) the reliance was reasonable under the circumstances.

Additionally, the court acknowledged that the fraud on the market presumption is couched in terms  of reliance on market price which is a misleading term in the short seller circumstance.  This is due to the fact that the short seller is always betting the stock price is too high, and will decrease, hence the short seller is not relying on the price. What is in play is a slightly broader

principle, that is, the short seller is relying on the <u>integrity</u> of the market to correct itself in the future.

The court wrote:

> Reliance on the integrity of the *market* in a stock differs from reliance on the integrity of the market *price* in that stock. An investor relying on the integrity of a market price in fact relies on other investors to interpret the relevant data and arrive at a price which, at the time of the transaction, reflects the true worth of the company. By contrast, an investor relying on the integrity of the market relies on the continuing ability of investors to interpret data subsequent to the transaction; he relies on future conditions. In the context of a short sale, the difference between these two types of reliance is more pronounced. The traditional purchaser depends on the "market" to determine a present value for the stock that allows the purchaser an adequate return on his investment. On the other hand, the short seller depends for a return on his investment on the "market" realizing that the value of the stock at the time of the short sale does not allow for an adequate return on the investment. This realization is what drives the price of the stock down and allows the short seller his profit.

*Id.* at 823 (emphasis in original). To actually prove reliance on the integrity of the market, the court paved the road for the short seller by outlining the types of proofs that such an investor may proffer at trial to substantiate reliance. It cited three examples. The short seller can prove reliance based on the market's integrity if: (1) the investor "changed his investment strategy and actually relied on the 'integrity' of the inflated market price"; (2) "[t]he rise [in price] [] increased [the investor's] risk of loss beyond acceptable levels, causing him to purchase"; or (3) it "led [the investor] to conclude that the stock would take so long to decline in value that the cost of maintaining his short position would exceed his potential gain." *Id.* at 824.

Having formulated the test for short sellers, the *Zlotnick* court was confronted with the issue of when should the test be applied. At what stage of the short sale transaction (initial sale or covering purchase) is reliance tested? The *Zlotnick* court found that the initial sale and covering

purchase are two distinct transactions.  It noted that "whether a short sale and covering purchase constitutes one transaction or two is important to the disposition of the case." *Id.* at 820-21 n. 3.  The court "view[ed] the covering purchase as a second, independent transaction" and for its analysis, it looked to the covering purchase in order to determine "whether Zlotnick sufficiently alleges reliance upon appellees' misrepresentations for that transaction." *Id.* at 821.  This was a practical determination. If the Court were to consider the short  sale as a single transaction, as the District Court had, then, it was "unclear when we should consider this single transaction to have occurred." *Id.* at 821 n. 4.  This implies that reliance is measured twice – at the time of the initial sale and at the covering purchase.

IV.

The issues facing this Court revolve around the *Zlotnick* roadmap in order to prove reliance for a short seller as well as the place in time when reliance must be shown.  In the context of this motion, the defendants argue that plaintiffs can not prove the third element of the reliance test, i.e., plaintiffs' reliance was reasonable.  Defendants contend that Rocker's prolific e-mails and communications to regulators, analysts, and reporters demonstrate that plaintiffs had knowledge of the fraud, thereby making any reliance unreasonable as a matter of law for any and all of the short sales.  The plaintiffs counter that they have shown sufficient facts under the *Zlotnick* roadmap to defeat the motion.  That is, for the period from December 8, 1999 through March 2, 2000 (roughly mirroring the period in which the Korean sales representations were made and when L&H stock prices soared), the price of L&H stock rose to unacceptable levels which forced plaintiff to cover. These arguments are considered below.

19

As noted above, defendants argue that plaintiffs had knowledge of fraud and as a result their reliance on the integrity of the market is not reasonable, thus barring recovery.  The courts have adopted this notion as a general rule.  The Supreme Court recognized the inherent logic of this rubric by adopting the imagery of a lower court.  The Court stated:  "[w]ho would knowingly roll the dice in a crooked crap game?" *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (quoting *Schlanger v. Four-Phase Systems Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y. 1982)).  "[G]eneral principles of equity suggest that only those who have pursued their own interests with care and good faith should qualify for the judicially created private 10b-5 remedies." *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1410 (6th Cir. 1991) (quoting *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir. 1977).  The judicially created remedy of 10b-5 was not crafted to protect investors who knowingly attempt to profit on an ongoing fraud and then seek relief from the courts when the fraud escalates and the profits turn to losses.  If this were the case, the short seller would be converting a 10b-5 remedy into an insurance policy protecting against its risky strategy.  *AUSA Life Ins. Co. v. Young*, 206 F.3d 202, 234 (2d Cir. 2000) ("The securities laws are, of course, not an insurance policy against all losses by investors, and the concept of proximate cause limits recovery to plaintiffs and to losses for which the intent of the laws is served by recovery and denies recovery when that intent is not served."); *JSMS Rural LP v. GMG Capital Partners III, LP*, No. 04 Civ. 8591 (SAS), 2006 U.S. Dist. LEXIS 54104, at *10  (S.D.N.Y. Aug. 4, 2006) ("Rule 10b-5 is not a 'partial downside insurance policy' for disgruntled investors.") (footnote omitted).  The *Zlotnick* court is in accord.  It noted that if Zlotnick had knowledge of fraud "it would not have been reasonable for [Zlotnick] to rely on the price of the stock as an accurate indication of the stock's value." *Zlotnick*, 836 F.2d at 822, n.6. The principle applies here as well.  Generally, plaintiffs can not recover once knowledge of fraud is

acquired for losses resulting from short sales with one exception (see pages 24-25 of this Opinion).

The rub in this case is when did Rocker acquire such knowledge. Defendants argue that Rocker had knowledge of the fraud at all times commencing from the initial acquisition of a short position (July, 1998). The facts with regard to Rocker's knowledge of fraud at that time are in dispute. According to the depositions, in July, 1998, Rocker initially acquired a short position because it doubted (a) the capabilities of management; (b) the strength and scope of L&H's market, and (c) the reliability of L&H's technology. None of these factors clearly warrants a finding as a matter of law that plaintiffs knew of the fraud at that point in time. They appear to be judgments which any diligent investor undertaking careful research may have reached based on the facts available in the marketplace at the time.

On the other hand, plaintiffs submit that they had no knowledge of fraud regarding the Korean operations between December 8, 1999 and March 2, 2000 – the period to which Plaintiffs believe this case is limited. As stated above, this is the approximate time frame in which the L&H Korean sales representations caused L&H's stock price to dramatically rise, allegedly requiring Rocker to cover.[12] However, there are substantial facts that Rocker had some awareness that wrongdoing was afoot at L&H as early as April, 1999. At that time, Rocker began communicating with regulators, analysts, and news reporters about L&H's "bogus" financial reporting (see page 5-6 of this Opinion). The plaintiffs distinguish between the Korean sales misrepresentations (December, 1999) and other previous fraudulent activities at L&H (BTG-related transaction scheme) without much legal support for doing so. According to plaintiffs, the Korean sales misrepresentations are

---

[12]     Korean sales representations occurred on December 28, 2000. There is nothing in the record which supports December 8, 2000 as a date of any significance.

the only ones which caused plaintiffs' loss, and the case should be so limited. The argument is unpersuasive. The issue is whether plaintiff had sufficient knowledge of fraud by L&H to render its reliance on the integrity of the market unreasonable. Once Rocker acquired knowledge of any material misrepresentations or other substantial fraudulent activity at L&H, reliance is unreasonable thereafter. To rule that this case is limited to the Korean sales misrepresentations is tantamount to allowing plaintiffs to "roll the dice in a crooked crap game." Once plaintiffs had knowledge of fraud, plaintiffs must act with good care and prudence in order to avail themselves to 10b-5 remedies. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988); *Archinges v. Columbus*, 934 F.2d 1402, 1410 (6th Cir. 1991). Hence, a reasonable fact finder could conclude that Rocker had sufficient knowledge of fraud sooner than December 2, 2000. A jury should determine this issue, including the date upon which plaintiffs acquired knowledge of fraud, if ever. It is a fact sensitive determination and may swing on the credibility of the witnesses. *See Cheek v. United States*, 498 U.S. 192, 203, (1991). In this sense, this case is similar to other security fraud cases because generally, "knowledge and belief are characteristically questions for the fact finder, in this case the jury." *Id.* at 203; *see also United States v. Reyes*, No. C 06-00556 CRB, 2007 U.S. Dist. LEXIS 60003, at *5-*6 (N.D. Cal. Aug. 7, 2007) (The court, in a criminal securities fraud case, noted that "[i]ntent is a question about what the defendant knew or believed. Such questions about state of mind ordinarily are for the jury to decide."). The issue which inures is how does the above determination square with the *Zlotnick* holding.

V.

Zlotnick held that a short seller who had no knowledge of fraud "is entitled to a chance to prove such actual reliance to the finder of fact". Zlotnick, 826 F. 2d at 824.  Some courts have broadly interpreted Zlotnick to have definitively ruled that a short seller with knowledge of fraud at the time of the covering purchase is barred from showing reliance, while a short seller with no such knowledge may prove actual reliance at trial.  See Zlotnick, 836 F.2d at 818; Jones v. Intelli-Check, Inc., 274 F. Supp. 2d 615 (D.N.J. 2003); Gilford Partners, L.P. v. Sensormatic Elec. Corp., No. 96 C 4072, 1997 WL 757495 (N.D. Ill. Nov. 24, 1997).

The defendants appear to argue this precise point; however, the Court does not read Zlotnick in that fashion. As noted above (page 18-19 of this Opinion), the Court disagrees that Zlotnick requires it to limit its analysis to evaluation of knowledge of fraud at the time of the covering purchase.  Zlotnick established that the short sale is comprised of two distinct transactions – the initial sale and covering purchase; and it implied that whether the short seller's reliance was reasonable should be reviewed at both times.   Unlike Zlotnick, where there was no knowledge of fraud at any point in the short sale transaction, the two distinct transaction analysis gives rise to at least three categories of transactions which may emerge in this case based on the jury determinations discussed above.  The first category of transactions are ones where Rocker had no knowledge of fraud either at the time of the initial sale or the covering purchase. In this case, the Zlotnick decision controls, and plaintiff will have the opportunity and the burden of proof to show actual reliance at trial.  The second category includes transactions where Rocker is found to have knowledge of fraud prior to   the initial sale and the covering purchase.   In this situation, Rocker's reliance is unreasonable as a matter of law. Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988) (see also,

23

discussion, pages 19-21 of this Opinion).   Therefore, Rocker cannot demonstrate reliance for such subsequent short sales, and is barred from recovering for any such losses.  Lastly, the Court is left with the "hybrid" type short seller, or the gray area between the two extremes delineated above. Here,  plaintiff, with no knowledge of a fraud, decides to sell short based on the innocent belief that a stock was overvalued, but learns of a fraud prior to covering. The Court finds that Plaintiff should have the opportunity to prove actual reliance at trial. To limit the Court's evaluation of knowledge of fraud to the covering purchase, as defendants suggest, would be an unduly harsh result under the circumstances here.   To preclude recovery in this situation would require the Court to abandon an "innocent" hybrid short seller in midstream without a remedy.  Such a result does not comport with the policy behind the securities fraud law.  It is a remedial statute, the purposes of which are to give defrauded investors a remedy and to deter fraud in the future.  *Halperin v. Jasper*, 723 F. Supp. 1091, 1095 (E.D. Pa. 1989) (noting that "the purpose of § 10(b) and Rule 10(b)(5)" include "redressing and deterring fraudulent practices and material misrepresentations in connection with the sale of securities").  The hybrid short seller should not be shortchanged (left without a remedy) by virtue of the place in time where the court tests for knowledge of fraud.

One may argue that the hybrid short seller should not have a remedy because to allow him to recover is tantamount to indemnifying against any loss which the hybrid short seller may incur, i.e., the hybrid short seller can either immediately sell upon learning of a fraud and sue for his losses, if any; or hold and wait for the market to negatively react to the fraud, if ever, thus  producing a profit.  Therefore in most instances, the hybrid short seller will at least be made whole.  This is not a compelling argument for three reasons.  First, in balancing the policy arguments, equity and fairness demand that for any cognizable loss, there is a remedy.  *Browning v. Peyton*, 918 F.2d 1516,

1522 (11th Cir. 1990) (in case alleging, *inter alia*, fraud involving the breach of a joint venture investment agreement, the court noted that "a maxim of equity states the ideal that 'Equity Will Not Suffer a Wrong to Be Without a Remedy'") (citing *William v. Beheler*, 499 S.W.2d 770, 778 (Mo. 1973)).  Secondly, it is a fair result, since it places a hybrid short seller in the same position as the *Zlotnick* plaintiff, both of whom are alike in the sense that neither knew of the fraud at the time of the initial sale, and each will have the same measure of damages.  Lastly, as in any case based on fraud, once a holder of a short position obtains knowledge of fraudulent activity or a material misrepresentation, he has a duty to mitigate.  *See In Re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370 (N.D. Cal. 1987); *Van Syckle v. C.L. King and Assoc., Inc.*, 822 F. Supp. 98, 102 (N.D.N.Y. 1992).  Hence, there will be a check on any strategy the hybrid short seller may concoct in order to maximize his recovery.  In short, if Rocker did not know of any fraud at the time of the initial sale, then it may utilize the *Zlotnick* roadmap, to the extent applicable, to prove actual reliance.  That is, Rocker may show, among other things, in order to demonstrate reliance, that the rise in price increased the risk of loss beyond acceptable levels, causing him to purchase, and/or the rise in price led him to conclude that the stock would take so long to decline in value that the cost of maintaining his short position would exceed his potential gain (for a discussion, see p. 18 of this Opinion).

Recapping this issue, the Court finds that it is a jury question as to when, if ever, Rocker acquired such knowledge of fraud so that its reliance on the integrity on the market is deemed

unreasonable.  Once the jury makes that decision, then the Court will review each transaction[13] and

subdivide the transactions into three separate categories as follows[14] for transactions where:

1.      No knowledge of fraud occurs until after covering purchase.  These transactions shall proceed in accordance with *Zlotnick*.

2.      Knowledge of fraud occurs prior to both initial sale and covering purchase.  These transactions shall be dismissed.

3.      Knowledge of fraud occurs after initial sale, but prior to covering purchase (hybrid). In these transactions, plaintiff may prove actual reliance based upon the market's integrity.

In addition, all claims that proceed (1 and 3 above) shall be subject to the affirmative defense of failure to mitigate damages.

## VI.

The other issue presented as part of this motion is whether plaintiff suffered an actual loss,

an essential element of a securities fraud case.  Generally, "failure to show actual damages is a fatal

defect in a Rule 10b-5 cause of action." *Newton v. Merrill Lynch*, 259 F.3d 154, 177-78 (3d Cir.

2001).  The statute provides that "no person permitted to maintain a suit for damages under the

provisions of this chapter shall recover, [] a total amount in excess of his actual damages on account

of the act complained of."  15 U.S.C. § 78bb(a).  However, neither Rule 10b-5 nor the Private

Securities Litigation Reform Act ("PSLRA") endorse any specific theory or methodology to quantify

---

[13] A determination as to the manner in which particular short positions held prior to knowledge are matched up with covering purchases after knowledge is attributed, e.g. First-in First-out ("FIFO"), Last-in First-out ("LIFO"), or possibly some other method, is left for another day.  *See generally In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338 (E.D. Pa. 2006).  Should this matter go forward, the Court will entertain arguments from the parties as to an appropriate method.

[14] The Court envisions a bifurcated trial, but reserves on the issue until the parties have an opportunity to address it.

economic loss.  *See In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 250 (E.D. Pa. 2006).  To determine whether there is an actual loss is a two-step inquiry.  First, the court must decide what methodology to employ. That is, whether the gains and losses of Rocker's short sales should be netted; or to use a transactional approach which considers each short sale individually, and allows plaintiff to recover on all losses without any offset for gains.  Secondly, the court must determine the damage period – that is, the period of time in which Rocker's short sales will be netted or considered on a transactional basis.

With regard to methodology, the netting approach shall be employed for the reasons set forth below.  While the parties point out that various circuits are inconsistent – some utilizing the transactional approach, and some using the netting approach – the Third Circuit has not squarely confronted the issue.  Furthermore, there are two district court decisions within the Third Circuit employing the transactional methodology.  *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 680 (E.D. Pa. 2004); *In re Cigna Corp. Sec. Litig.*, 459 F.Supp.2d 338, 352 (E.D. Pa. 2006)  (acknowledging that "[t]he Third Circuit has not had occasion to consider the issue," and the court had "fundamental concerns [] about adopting any specific theory as a matter of law.").  On the other hand, the Second, Fifth, Ninth and Tenth Circuits maintain that the limitation to "actual damages" requires the netting of plaintiffs' losses against its profits attributable to the same fraud.  *See Abrahamson v. Fleschner*, 568 F.2d 862, 878-79 (2d Cir. 1976), cert. denied 436 U.S. 913 (1978); *Byrnes v. Faulkner, Dawkins & Sullivan*, 550 F.2d 1303, 1313-14 (2d Cir. 1977); *Blackie v. Barrack*, 524 F.2d 891, 908-09 (9th  Cir. 1975), cert. denied, 429 U.S. 816 (1976); *Wolf v. Frank*, 477 F.2d 467, 478, 479 (5th Cir. 1973), cert. denied 414 U.S. 975 (1973); *Richardson v. MacArthur*, 451 F.2d 35, 43-44 (10th Cir. 1971).

As this Court sees it, whether the netting or transactional approach is utilized depends on the circumstances.  Since using the netting or transactional approach is a fact-sensitive inquiry, it is best accomplished on a case-by-case basis. *Blackie*, 524 F.2d at 908-09.  In *Blackie*, the Court observed that  "while out of pocket loss is the ordinary standard in a 10b-5 suit, . . . [i]t is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages." *Id.* at 909 (citations omitted).  Accordingly, there may not be a circuit split, but rather a recognition that either approach may be utilized depending on the facts.

Here, there are hundreds, if not thousands, of short transactions involving millions of shares on an ongoing basis for a period of about 30 months.  Rocker constantly communicated with regulators, analysts and reporters about L&H's operations and financial reporting during the time period and continually adjusted its position in L&H stock.  In short, there was an ongoing trading strategy of Rocker to manage its position in L&H stock.  Under the circumstances, there is a continuum of activity.  In this instance, the netting approach is most appropriate because it best reflects the activities of the investor during the damage period.

VII.

"The 'damage period'[15] or 'class period' in a securities fraud case is generally the period of time during which plaintiffs allege that the stock price of the defendant corporation was inflated due to fraudulent statements made by company management, and ends when corrective statements are made (usually accompanied by a drop in price)." *In re Cigna*, 459 F. Supp. 2d at 339, n.1.   Plaintiffs suggest, without any legal support or even much factual background, that the damage period runs from December 8, 1999 through March 2, 2000, which encompasses the time that plaintiffs maintain the fraud exerted pressure on them, causing them to cover.  Defendants, on the other hand, argue that the usual damage period applies; that is, it should commence on the first instance of the alleged fraud or, at the latest, the date plaintiffs executed its first trade in L&H stock (which occurred on July 24, 1998) and conclude on November 9, 2000, the date on which a "curative disclosure" was made (rendering unreasonable any further reliance by the market on the company's representations).  *See In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984), *rev'd on other grounds*, 843 F.2d 1537 (3d Cir. 1988).  One must recognize that  the intent of  *Zlotnick*  was, in part, to cobble together a cause of action for short sellers who do not tidily fit into the parameters of securities fraud law, because the law was conceived with long investors in mind.  Accordingly, short sellers and long investors should be treated alike to the extent practicable.  Neither party has pointed to a case or a

---

[15]      After oral argument, further briefing and other data was requested from the parties in order to assist in determining the damage period. The reason for same was that the original briefs did not contain sufficient information for the Court to evaluate the precise implications of its decision on the issue.  At present, the Court remains unable to make such a determination; but is satisfied that the ambiguity results from the lack of a resolution of the knowledge issue discussed previously, as well as widely disputed facts and expert opinions with regard to the number of short positions held by Rocker at any given time.

policy reason that suggests that the damage period in a short selling context should be any different from a classic securities litigation.  It is this Court's conclusion that the damage period runs from the date that the stock price was inflated due to the fraud or plaintiffs' first transaction, whichever is later, and ends when corrective statements were published or the date when plaintiffs made their last covering purchase, whichever is earlier.  *In re Data Access Sys.*, 103 F.R.D. at 143.[16]  In hindsight, it is known that L & H restated financial statements for the years 1998, 1999 and 2000 due to inaccuracies, hence, Plaintiffs' transactions in those years will be netted.

VIII.

In light of the Court's holding on the reliance issue, and the substantial discrepancies in short positions held throughout the damage period, the Court cannot determine whether netting of transactions during the damage period ultimately eliminates any economic loss and effectively grants summary judgment to defendants.  Since it is unclear, the motion is denied.

The adage that "reasonable minds may differ" applies to this case, and review of this Opinion by the Third Circuit will assist in the ultimate disposition of the matter. The applicable statute reads:

> [w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate

---

[16]     Although the classic damage period for a securities litigation is accepted here, the Court acknowledges this may give rise to some other issues.  One such issue is whether the damage period ends when curative disclosures were made or upon publication of the WSJ article on August 8, 2000, which described L&H's Korean sales "as discrepancies which undermine the credibility."  *See McFarland v. Memorex Corp.*, 96 F.R.D. 357, 364 (N.D. Cal.1982).   The Court will determine that issue and other issues associated with the damages period in due course after it is more fully briefed by the parties in light of this Opinion.

> appeal from the order may materially advance the ultimate termination of the litigation, [the Court] shall so state in writing such order.   28 U.S.C. § 1292(b).

In order to certify a question to the Court of Appeals, a district court must determine:  (1) that the certified order involves a controlling question of law; (2) that there is substantial ground for difference of opinion with respect to that question; and (3) that immediate appeal may materially advance the ultimate termination of the litigation.  28 U.S.C. § 1292(b).  All three factors must be satisfied.  *See Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974).  The decision to grant a section 1292(b) certification for interlocutory appeal is "wholly within the discretion of the district court.  *Bachowski v. Usery*, 545 F.2d 363, 368 (3d Cir. 1976) *overruled in part on other grounds*, *Local No. 82 Furniture & Piano Moving v. Crowley*, 467 U.S. 526 (1984).  Certification, however, is only appropriate in exceptional circumstances, and "a district court should be mindful of the strong policy against piecemeal appeals when exercising its discretion." *Koken v. Viad Corp.*, No. Civ.A.03-5975, 2004 WL 1240672, at *1 (E.D.Pa. May 11, 2004); *Orson, Inc. v. Mirimax Film Corp.*, 867 F. Supp. 319, 321 (E.D. Pa. 1994) *aff'd in part and vacated in part on other grounds*, 79 F.3d 1358 (3d Cir. 1996).

In deciding whether to certify an order for interlocutory appeal, "the key consideration is...whether the order...truly implicates the policies favoring interlocutory appeal.... Those policies...include[ ] the avoidance of harm to a party *pendente lite* from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation expense." *Katz*, 496 F.2d at 756.

This Court is of the opinion that the following issues meet the three criteria sufficient to warrant an interlocutory appeal: (1) whether, and if so how, plaintiff can demonstrate reliance under the §10b and Rule 10b-5 framework; (2) how to determine the damage period when dealing in the context of a short seller; and (3) whether a cumulative/netting approach or transaction-based methodology is the proper method to calculate "actual damages" under §10b and Rule 10b-5.  In addition, plaintiffs had previously moved before this Court for certification, pursuant to Fed. R. Civ. P. 54(b), of the dismissal of KPMG UK and KPMG, LLC. The motion was denied without prejudice. In light of this Court's decision to certify the aforementioned issues for an interlocutory appeal, it is reasonable to certify this issue also in order to avoid piecemeal litigation.  Accordingly, the immediate appeal of the dismissal of KPMG UK and KPMG, LLC is granted.


     s/*Peter G. Sheridan*         
     PETER G. SHERIDAN, U.S.D.J.

September 24, 2007

32